# MERRILL v. NATIONAL BANK OF JACKSON-VILLE.

## SAME v. SAME.

### APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

Nos. 54, 55. Argued October 20, 21, 1898.— Decided February 20, 1899.

As the controversy in this case involved the question on what basis dividends in insolvency should have been declared, and therein the enforcement of the trust in accordance with law, this court has jurisdiction of it in equity.

Less than two years having elapsed from the payment of the first dividend to the filing of this bill, and the other creditors of the bank not having been harmed by the delay, no presumption of laches is raised, nor can an estoppel properly be held to have arisen.

A secured creditor of an insolvent national bank may prove and receive dividends upon the face of his claim as it stood at the time of the declaration of insolvency, without crediting either his collaterals, or collections made therefrom after such declaration, subject always to the proviso that dividends must cease when, from them and from collaterals realized, the claim has been paid in full.

On the seventeenth day of July, A.D. 1891, the First National Bank of Palatka, Florida, a banking association incorporated under the laws of the United States, having its place of business at Palatka, Florida, failed and closed its doors. Subsequently T. B. Merrill was duly appointed receiver of the bank by the Comptroller of the Currency, and entered upon the discharge of his duties. At the time of the failure of the bank, it was indebted to the National Bank of Jacksonville in the sum of $6010.47, on sundry drafts, which indebtedness was unsecured; and also in the sum of $10,093.34, being $10,000, and interest, for money borrowed June 5, 1891, evidenced by a certificate of deposit, which was secured by sundry notes belonging to the First National Bank of Palatka, attached to the certificate as collateral. These notes aggregated $10,896.22, the largest being a note of A. L. Hart for $5350.22. The

National Bank of Jacksonville proved its claim upon the unsecured drafts for $6010.47, and as to this there was no controversy. It also offered to prove its claim for $10,093.34, but the receiver would not permit it to do this, and, under the ruling of the Comptroller of the Currency, it was ordered first to exhaust the collaterals given to secure the certificate of deposit, and then to prove for the balance due, after applying the proceeds of the collaterals in part payment.

The Jacksonville Bank collected all the notes excepting that of A. L. Hart, obtained a judgment on the latter, which it assigned and transferred to the receiver, applied the proceeds of the collaterals which it had collected to its claim on the certificate, and proved for the balance due thereon, being the sum of $4496.44. On December 1, 1892, a dividend of $1573.75 was paid on the claim as thus proven, and on May 17, 1893, a second dividend of $449.64 was paid.

On the eleventh of September, 1894, the Jacksonville Bank filed its bill of complaint in the Circuit Court of the United States for the Southern District of Florida against Merrill as receiver, which set forth the foregoing facts, complained of the action of the receiver in not permitting proof for the full amount of the certificate of deposit, and alleged that it " gave due notice that it would demand a *pro rata* dividend upon the whole amount due your orator, without deducting the amount collected on collateral security, to wit, that it would demand a *pro rata* dividend upon $16,103.81, and interest thereon from the 17th day of July, A.D. 1891."

The prayer of the bill was, among other things, for a *pro rata* distribution on the entire amount of the indebtedness.

The defendant demurred to the bill, and, the demurrer having been overruled, answered, denying " that the complainant gave due notice that it would demand a *pro rata* dividend upon the whole amount due to it without deducting the amount collected on collateral security ; " and averring to the contrary that " the complainant accepted the said ruling of the said Comptroller without demur and accepted from the said Comptroller, through this defendant, without protesting notice of any kind, the checks of the said Comptroller

in payment of the dividends mentioned in the bill, and that it was not until the 15th of March, 1894, that the complainant gave notice of any kind that it dissented from the said ruling of the Comptroller and would demand payment upon a different basis."

Sundry exceptions were taken to the answer, which were overruled, and the cause was set down for final hearing on bill and answer.

The Circuit Court entered its decree, January 29, 1896, that complainant was entitled to receive dividends on the whole face of the indebtedness due July 17, 1891, less the dividends actually paid to it; that the receiver declare the dividend on the basis of the whole claim, and pay it out of any assets which were in his hands March 15, 1894; and that he render an account.

From this decree the receiver prosecuted an appeal to the Circuit Court of Appeals for the Fifth Circuit. That court, differing from the Circuit Court as to the form of its decree, reversed it and remanded the cause, with directions to enter a decree that the Jacksonville Bank was entitled to prove its claims to the entire amount of the indebtedness, and to the payment thereon of the same dividends as had been paid on other indebtedness of the Palatka Bank, with interest on such dividends from the date of the declaration thereof, less a credit of the sums which had been paid as dividends on the part of the claim theretofore allowed provided the dividends theretofore paid and thereafter to be paid on the sum of $10,093.34, together with the amounts theretofore and thereafter received on the collaterals securing that indebtedness, should not exceed one hundred cents on the dollar of the principal and interest of said debt; that the receiver recognize the Jacksonville Bank as creditor of the Palatka Bank in said sum of $10,093.34 as of July 17, 1891, and pay dividends as aforesaid thereon, or certify the same to the Comptroller of the Currency, to be paid in due course of administration; and that the Jacksonville Bank receive, before further payment to other creditors, its due proportion of the dividends as thus declared, with interest. 41 U. S. App. 529. From that decree,

after the mandate of the Circuit Court of Appeals had been sent down to the Circuit Court, and proceedings had thereunder, an appeal was taken and perfected to this court and is numbered 54 of this term.

The decree was entered by the Circuit Court in pursuance of the mandate of the Circuit Court of Appeals, July 27, 1896, and the receiver prayed an appeal therefrom to the Circuit Court of Appeals, which was by that court dismissed on motion of the Jacksonville Bank. 41 U. S. App. 645. From this decree of dismissal, an appeal was allowed and perfected to this court, and is numbered 55 of this term.

These appeals were argued together.

*Mr. Edward Winslow Paige* and *Mr. Francis F. Oldham* for appellant.

*Mr. William Worthington* for appellee. *Mr. George H. Yeaman* was on his brief. *Mr. J. C. Cooper* filed a brief for appellee.

MR. CHIEF JUSTICE FULLER, after making the above statement, delivered the opinion of the court.

The Circuit Court of Appeals reversed the decree of the Circuit Court with specific directions. Nothing remained for the Circuit Court to do except to enter a decree in accordance with the mandate, and, for the purposes of an appeal to this court, the decree of the Circuit Court of Appeals was final. The mandate went down and the Circuit Court entered its decree in strict conformity therewith before the appeal in No. 54 was prosecuted to this court. This promptness of action did not, however, cut off that appeal, and any difficulty in our dealing with the cause in the Circuit Court was obviated by the second appeal, which brings before us in No. 55 the record subsequent to the first decree of the Circuit Court of Appeals.

It is contended that the bill should have been dismissed because of adequate remedy at law, and on the ground of

laches and estoppel. As the controversy involved the question on what basis dividends should have been declared, and therein the enforcement of the administration of the trust in accordance with law, we have no doubt of the jurisdiction in equity.

Nor was the lapse of time such as to raise any presumption of laches, nor could an estoppel properly be held to have arisen. Less than two years had elapsed from the payment of the first dividend to the filing of the bill, and the other creditors of the insolvent bank had not been harmed by the temporary submission of complainant to the ruling of the Comptroller. The decree affected only assets on hand or such as might be subsequently discovered; and if the other creditors had no rights superior to that of complainant, they lost nothing by the reduction of their dividends, if any, afterwards declared to be paid out of such assets.

The inquiry on the merits is, generally speaking, whether a secured creditor of an insolvent national bank may prove and receive dividends upon the face of his claim as it stood at the time of the declaration of insolvency, without crediting either his collaterals, or collections made therefrom after such declaration, subject always to the proviso that dividends must cease when from them and from collaterals realized, the claim has been paid in full.

Counsel agree that four different rules have been applied in the distribution of insolvent estates, and state them as follows:

"Rule 1. The creditor desiring to participate in the fund is required first to exhaust his security and credit the proceeds on his claim, or to credit its value upon his claim and prove for the balance, it being optional with him to surrender his security and prove for his full claim.

"Rule 2. The creditor can prove for the full amount, but shall receive dividends only on the amount due him at the time of distribution of the fund; that is, he is required to credit on his claim, as proved, all sums received from his security, and may receive dividends only on the balance due him.

"Rule 3. The creditor shall be allowed to prove for, and receive dividends upon, the amount due him at the time of proving or sending in his claim to the official liquidator, being required to credit as payments all the sums received from his security prior thereto.

"Rule 4. The creditor can prove for, and receive dividends upon, the full amount of his claim, regardless of any sums received from his collateral after the transfer of the assets from the debtor in insolvency, provided that he shall not receive more than the full amount due him."

The Circuit Court and the Circuit Court of Appeals held the fourth rule applicable, and decreed accordingly.

This was in accordance with the decision of the Circuit Court of Appeals for the Sixth Circuit, in *Chemical National Bank* v. *Armstrong*, 16 U. S. App. 465, Mr. Justice Brown, Circuit Judges Taft and Lurton, composing the court. The opinion was delivered by Judge Taft, and discusses the question on principle with a full citation of the authorities. We concur with that court in the proposition that assets of an insolvent debtor are held under insolvency proceedings in trust for the benefit of all his creditors, and that a creditor, on proof of his claim, acquires a vested interest in the trust fund; and, this being so, that the second rule before mentioned must be rejected, as it is based on the denial, in effect, of a vested interest in the trust fund, and concedes to the creditor simply a right to share in the distributions made from that fund according to the amount which may then be due him, requiring a readjustment of the basis of distribution at the time of declaring every dividend, and treating, erroneously as we think, the claim of the creditor to share in the assets of the debtor, and his debt against the debtor, as if they were one and the same thing.

The third and fourth rules concur in holding that the creditor's right to dividends is to be determined by the amount due him at the time his interest in the assets becomes vested, and is not subject to subsequent change, but they differ as to the point of time when this occurs.

In *Kellock's case*, L. R. 3 Ch. App. 769, it was held that

the creditor's interest in the general fund to be distributed vested at the date of presenting or proving his claim; and this rule has been followed in many jurisdictions where statutory provisions have been construed to require an affirmative election to become a beneficiary thereunder. For instance, the cases in Illinois construing the assignment act of that State, which are well considered and full to the point, hold that the interest of each creditor in the assigned estate " only vests in him when he signifies his assent to the assignment by filing his claim with the assignee." *Levy* v. *Chicago National Bank*, 158 Illinois, 88; *Furness* v. *Union National Bank*, 147 Illinois, 570.

On the other hand, the Supreme Court of Pennsylvania in *Miller's Appeal*, 35 Penn. St. 481, and many subsequent cases, has held, necessarily in view of the statutes of Pennsylvania regulating the matter, that the interest vests at the time of the transfer of the assets in trust. In that case the debtor executed a general assignment for the benefit of creditors. Subsequently the assignor became entitled to a legacy which was attached by a creditor, who realized therefrom $2402.87. It was held that such creditor was notwithstanding entitled to a dividend out of the assigned estate on the full amount of his claim at the time of the execution of the assignment. Mr. Justice Strong, then a member of the state tribunal, said: " By the deed of assignment, the equitable ownership of all the assigned property passed to the creditors. They became joint proprietors, and each creditor owned such a proportional part of the whole as the debt due to him was of the aggregate of the debts. The extent of his interest was fixed by the deed of trust. It was, indeed, only equitable; but whatever it was, he took it under the deed, and it was only as a part owner that he had any standing in court when the distribution came to be made. . . . It amounts to very little to argue that Miller's recovery of the $2402.87 operated with precisely the same effect as if a voluntary payment had been made by the assignor after his assignment; that is, that it extinguished the debt to the amount recovered. No doubt it did, but it is not as a creditor that he is entitled to a distributive share of

the trust fund. His rights are those of an owner by virtue of the deed of assignment. The amount of the debt due to him is important only so far as it determines the extent of his ownership. The reduction of that debt, therefore, after the creation of the trust, and after his ownership had become vested, it would seem, must be immaterial."

Differences in the language of voluntary assignments and of statutory provisions naturally lead to particular differences in decision, but the principle on which the third and fourth rules rest is the same. In other words, those rules hold, together with the first rule, that the creditor's right to dividends is based on the amount of his claims at the time his interest in the assets vests by the statute, or deed of trust, or rule of law, under which they are to be administered.

The first rule is commonly known as the bankruptcy rule, because enforced by the bankruptcy courts in the exercise of their peculiar jurisdiction, under the bankruptcy acts, over the property of the bankrupt, in virtue of which creditors holding mortgages or liens thereon might be required to realize on their securities, to permit them to be sold, to take them on valuation, or to surrender them altogether, as a condition of proving against the general assets.

The fourth rule is that ordinarily laid down by the chancery courts, to the effect that, as the trust created by the transfer of the assets by operation of law or otherwise, is a trust for all creditors, no creditor can equitably be compelled to surrender any other vested right he has in the assets of his debtor in order to obtain his vested right under the trust. It is true that, in equity, a creditor having a lien upon two funds may be required to exhaust one of them in aid of creditors who can only resort to the other, but this will not be done when it trenches on the rights or operates to the prejudice of the party entitled to the double fund. Story Eq. Jur. (13th ed.) § 633; *In re Bates*, 118 Illinois, 524. And it is well established that in marshalling assets, as respects creditors, no part of his security can be taken from a secured creditor until he is completely satisfied. Leading Cases in Equity, White & Tudor, Vol. II, Part 1, 4th Amer. ed., pp. 258, 322.

In *Greenwood* v. *Taylor*, 1 Russ. & Myl. 185, Sir John Leach applied the bankruptcy rule in the administration of a decedent's estate, and remarked that the rule was "not founded, as has been argued, upon the peculiar jurisdiction in bankruptcy, but rests upon the general principles of a court of equity in the administration of assets;" and referred to the doctrine requiring a creditor having two funds as security, one of which he shares with others, to resort to his sole security first. But *Greenwood* v. *Taylor* was in effect overruled by Lord Cottenham in *Mason* v. *Bogg*, 2 Myl. & Cr. 443, 488, and expressly so by the Court of Appeal in Chancery in *Kellock's case;* and the application of the bankruptcy rule rejected.

In *Kellock's case*, Lord Justice W. Page Wood, soon afterwards Lord Chancellor Hatherly, said:

"Now in the case of proceedings with reference to the administration of the estates of deceased persons, Lord Cottenham put the point very clearly, and said: 'A mortgagee has a double security. He has a right to proceed against both, and to make the best he can of both. Why he should be deprived of this right because the debtor dies, and dies insolvent, it is not very easy to see.'

"Mr. De Gex, who argued this case very ably, says that the whole case is altered by the insolvency. But where do we find such a rule established, and on what principle can such a rule be founded, as that where a mortgagor is insolvent the contract between him and his mortgagee is to be treated as altered in a way prejudicial to the mortgagee, and that the mortgagee is bound to realize his security before proceeding with his personal demand.

"It was strongly pressed upon us, and the argument succeeded before Sir J. Leach in *Greenwood* v. *Taylor*, that the practice in bankruptcy furnishes a precedent which ought to be followed. But the answer to that is, that this court is not to depart from its own established practice, and vary the nature of the contract between mortgagor and mortgagee by analogy to a rule which has been adopted by a court having a peculiar jurisdiction, established for administering the property

of traders unable to meet their engagements, which property that court found it proper and right to distribute in a particular manner, different from the mode in which it would have been dealt with in the Court of Chancery. . . . We are asked to alter the contract between the parties by depriving the secured creditor of one of his remedies, namely, the right of standing upon his securities until they are redeemed."

And it was the established rule in England prior to the Judicature Act, 38 and 39 Victoria, c. 77, that in an administration suit a mortgagee might prove his whole debt and afterwards realize his security for the difference, and so as to creditors with security, where a company was being wound up under the Companies Act of 1862. 1 Daniel's Ch. Pr. 384; *In re Withernsea Brick Works*, L. R. 16 Ch. Div. 337.

Certainly the giving of collateral does not operate of itself as a payment or satisfaction either of the debt or any part of it, and the debtor, who has given collateral security, remains debtor, notwithstanding, to the full amount of the debt; and so in *Lewis* v. *United States*, 92 U. S. 618, 623, it was ruled that: " It is a settled principle of equity that a creditor holding collaterals is not bound to apply them before enforcing his direct remedies against the debtor."

Doubtless the title to collaterals pledged for the security of a debt vests in the pledgee so far as necessary to accomplish that purpose, but the obligation to which the collaterals are subsidiary remains the same. The creditor can sue, recover judgment, and collect from the debtor's general property, and apply the proceeds of the collateral to any balance which may remain. Insolvency proceedings shift the creditor's remedy to the interest in the assets. As between debtor and creditor, moneys received on collaterals are applicable by way of payment, but as under the equity rule the creditor's rights in the trust fund are established when the fund is created, collections subsequently made from, or payments subsequently made on, collateral, cannot operate to change the relations between the creditor and his co-creditors in respect of their rights in the fund.

As Judge Taft points out, it is because of the distinction

between the right *in personam* and the right *in rem* that interest is only added up to the date of insolvency, although after the claims as allowed are paid in full, interest accruing may then be paid before distribution to stockholders.

In short, the secured creditor is not to be cut off from his right in the common fund because he has taken security which his co-creditors have not. Of course, he cannot go beyond payment, and surplus assets or so much of his dividends as are unnecessary to pay him must be applied to the benefit of the other creditors. And while the unsecured creditors are entitled to be substituted as far as possible to the rights of secured creditors, the latter are entitled to retain their securities until the indebtedness due them is extinguished.

The contractual relations between borrower and lender, pledging collaterals, remain, as is said by the New York Court of Appeals in *People* v. *Remington,* 121 N. Y. 328, 336, "unchanged when insolvency has brought the general estate of the debtor within the jurisdiction of a court of equity for administration and settlement." The creditor looks to the debtor to repay the money borrowed, and to the collateral to accomplish this in whole or in part, and he cannot be deprived either of what his debtor's general ability to pay may yield, or of the particular security he has taken.

We cannot concur in the view expressed by Chief Justice Parker in *Amory* v. *Francis,* 16 Mass. 308, 311, (1820) that "the property pledged is in fact security for no more of the debt, than its value will amount to; and for all the rest, the creditor relies upon the personal credit of his debtor, in the same manner he would for the whole, if no security were taken."

We think the collateral is security for the whole debt and every part of it, and is as applicable to any balance that remains after payment from other sources as to the original amount due; and that the assumption is unreasonable that the creditor does not rely on the responsibility of his debtor according to his promise.

The ruling in *Amory* v. *Francis* was disapproved, shortly

after it was made, by the Supreme Court of New Hampshire in *Moses* v. *Ranlet*, 2 N. H. 488, (1822) Woodbury, J., afterwards Mr. Justice Woodbury of this court, delivering the opinion, and is rejected by the preponderance of decisions in this country, which sustain the conclusion that a creditor, with collateral, is not on that account to be deprived of the right to prove for his full claim against an insolvent estate. Many of the cases are referred to in *Bank* v. *Armstrong*, and these and others given in the Encyclo. of Law and Eq. 2d ed. vol. 3, p. 141.

Does the legislation in respect to the administration of national banks require the application of the bankruptcy rule? If not, we are of opinion that the equity rule was properly applied in this case.

By section 5234 of the Revised Statutes, and section 1 of the act of June 30, 1876, c. 156, 19 Stat. 63, the Comptroller of the Currency is authorized to appoint a receiver to close up the affairs of a national banking association when it has failed to redeem its circulation notes, when presented for payment; or has been dissolved and its charter forfeited; or has allowed a judgment to remain against it unpaid for thirty days; or whenever the Comptroller shall have become satisfied of its insolvency after examining its affairs. Such receiver is to take possession of its effects, liquidate its assets and pay the money derived therefrom to the Treasurer of the United States.

Section 5235 of the Revised Statutes requires the Comptroller, after appointing such receiver, to give notice by newspaper advertisement for three consecutive months, "calling on all persons who may have claims against such association to present the same, and to make legal proof thereof."

By section 5242, transfers of its property by a national banking association after the commission of an act of insolvency, or in contemplation thereof, to prevent distribution of its assets in the manner provided by the chapter of which that section forms a part, or with a view to preferring any creditor except in payment of its circulating notes, are declared to be null and void.

Section 5236 is as follows:

"From time to time, after full provision has first been made for refunding to the United States any deficiency in redeeming the notes of such association, the Comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction, or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held."

In *Cook County National Bank* v. *United States*, 107 U. S. 445, it was ruled that the statute furnishes a complete code for the distribution of the effects of an insolvent national bank; that its provisions are not to be departed from; and that the bankrupt law does not govern distribution thereunder. The question now before us was not treated as involved and was not decided, but the case is in harmony with *Bank* v. *Colby*, 21 Wall. 609, and *Scott* v. *Armstrong*, 146 U. S. 499, which proceed on the view that all rights, legal or equitable, existing at the time of the commission of the act of insolvency which led to the appointment of the receiver, other than those created by preference forbidden by section 5242, are preserved; and that no additional right can thereafter be created, either by voluntary or involuntary proceedings. The distribution is to be "ratable" on the claims as proved or adjudicated, that is, on one rule of proportion applicable to all alike. In order to be "ratable" the claims must manifestly be estimated as of the same point of time, and that date has been adjudged to be the date of the declaration of insolvency. *White* v. *Knox*, 111 U. S. 784. In that case it appeared that the Miners' National Bank had been put in the hands of a receiver by the Comptroller of the Currency, December 20, 1875. White presented a claim for $60,000, which the Comptroller refused to allow. White then brought suit to have his claim adjudicated, and on June 23, 1883, recovered judgment for $104,523.72, be-

ing the amount of his claim with interest to the date of the judgment. Meanwhile the Comptroller had paid the other creditors ratable dividends, aggregating sixty-five per cent of the amounts due them, respectively, as of the date when the bank failed. When White's claim was adjudicated, the Comptroller calculated the amount due him according to the judgment as of the date of the failure, and paid him sixty-five per cent on that amount. White admitted that he had received all that was due him on the basis of distribution assumed by the Comptroller, but claimed that he was entitled to have his dividends calculated on the face of the judgment, which would give him several thousand dollars more than he had received, and he applied for a mandamus to compel the payment to him of the additional sum. The writ was refused by the court below and its judgment was affirmed. Mr. Chief Justice Waite, speaking for the court, said : " Dividends are to be paid to all creditors, ratably, that is to say, proportionally. To be proportionate they must be made by some uniform rule. They are to be paid on all claims against the bank previously proved and adjudicated. All creditors are to be treated alike. The claim against the bank, therefore, must necessarily be made the basis of the apportionment. . . . The business of the bank must stop when insolvency is declared. Rev. Stat. § 5228. No new debt can be made after that. The only claims the Comptroller can recognize in the settlement of the affairs of the bank are those which are shown by proof satisfactory to him or by the adjudication of a competent court to have had their origin in something done before the insolvency. It is clearly his duty, therefore, in paying dividends, to take the value of the claim at that time as the basis of distribution."

In *Scott* v. *Armstrong*, 146 U. S. 499, 510, it was argued that the ordinary equity rule of set-off in case of insolvency did not apply to insolvent national banks in view of sections 5234, 5236 and 5242 of the Revised Statutes. It was urged " that these sections by implication forbid this set-off because they require that after the redemption of the circulating notes has been fully provided for, the assets shall be ratably distributed among the creditors, and that no preferences given or suffered,

in contemplation of or after committing the act of insolvency, shall stand;" and "that the assets of the bank existing at the time of the act of insolvency include all its property without regard to any existing liens thereon or set-offs thereto." But this court said: " We do not regard this position as tenable. Undoubtedly, any disposition by a national bank, being insolvent or in contemplation of insolvency, of its choses in action, securities or other assets, made to prevent their application to the payment of its circulating notes, or to prefer one creditor to another, is forbidden; but liens, equities or rights arising by express agreement, or implied from the nature of the dealings between the parties, or by operation of law, prior to insolvency and not in contemplation thereof, are not invalidated. The provisions of the act are not directed against all liens, securities, pledges or equities, whereby one creditor may obtain a greater payment than another, but against those given or arising after or in contemplation of insolvency. Where a set-off is otherwise valid, it is not perceived how its allowance can be considered a preference, and it is clear that it is only the balance, if any, after the set-off is deducted which can justly be held to form part of the assets of the insolvent. The requirement as to ratable dividends is to make them from what belongs to the bank, and that which at the time of the insolvency belongs of right to the debtor does not belong to the bank."

The set-off took effect as of the date of the declaration of insolvency, but outstanding collaterals are not payment, and the statute does not make their surrender a condition to the receipt by the creditor of his share in the assets.

The rule in bankruptcy went upon the principle of election; that is to say, the secured creditor "was not allowed to prove his whole debt, unless he gave up any security held by him on the estate against which he sought to prove. He might realize his security himself if he had power to do so, or he might apply to have it realized by the Court of Bankruptcy, or by some other court having competent jurisdiction, and might prove for any deficiency of the proceeds to satisfy his demand; but if he neglected to do this and proved for his whole debt he

was bound to give up his security." Robson, Law Bank. 336. But it was only under bankrupt laws that such election could be compelled. *Tayloe* v. *Thompson*, 5 Pet. 358, 369.

And we are unable to accept the suggestion that compulsion under those laws was the result merely of the provision for ratable distribution, which only operated to prevent preferences, and to make all kinds of estates, both real and personal, assets for the payment of debts, and to put specialty and simple contract creditors on the same footing; and so gave to all creditors the right to come upon the common fund. Equality between them was equity, but that was not inconsistent with the common law rule awarding to diligence, prior to insolvency, its appropriate reward; or with conceding the validity of prior contract rights.

We repeat that it appears to us that the secured creditor is a creditor to the full amount due him, when the insolvency is declared, just as much as the unsecured creditor is, and cannot be subjected to a different rule. And as the basis on which all creditors are to draw dividends is the amount of their claims at the time of the declaration of insolvency, it necessarily results, for the purpose of fixing that basis, that it is immaterial what collateral any particular creditor may have. The secured creditor cannot be charged with the estimated value of the collateral, or be compelled to exhaust it before enforcing his direct remedies against the debtor, or to surrender it as a condition thereto, though the receiver may redeem or be subrogated as circumstances may require.

Whatever Congress may be authorized to enact by reason of possessing the power to pass uniform laws on the subject of bankruptcies, it is very clear that it did not intend to impinge upon contracts existing between creditors and debtors, by anything prescribed in reference to the administration of the assets of insolvent national banks. Yet it is obvious that the bankruptcy rule converts what on its face gives the secured creditor an equal right with other creditors into a preference against him, and hence takes away a right which he already had. This a court of equity should never do, unless required by statute, at the time the indebtedness was created.

The requirement of equality of distribution among creditors by the national banking act involves no invasion of prior contract rights of any such creditors, and ought not to be construed as having, or being intended to have, such a result.

Our conclusion is that the claims of creditors are to be determined as of the date of the declaration of insolvency, irrespective of the question whether particular creditors have security or not. When secured creditors have received payment in full, their right to dividends, and their right to retain their securities cease, but collections therefrom are not otherwise material. Insolvency gives unsecured creditors no greater rights than they had before, though through redemption or subrogation or the realization of a surplus they may be benefited.

The case was rightly decided by the Circuit Court of Appeals; its decree in No. 54 is

> *Affirmed, and the decree of the Circuit Court entered July 27, 1896, in pursuance of the mandate of that court, also affirmed, and the case remanded accordingly.*

MR. JUSTICE WHITE, with whom concurred MR. JUSTICE HARLAN and MR. JUSTICE McKENNA, dissenting:

The court now decides: 1st. That on the failure of a national bank a creditor thereof whose debt is secured by pledge is entitled to be recognized and classed by the Comptroller of the Currency to the full amount of his debt, without in any way taking into account the collaterals by which the debt is secured, and on the amount so recognized he is entitled to be paid out of the general assets the sum of any dividends which may be declared. 2d. That this right to be classed for the full amount of the debt, without regard to the value of the collaterals, is fixed by the date of the insolvency and continues to the final distribution, whatever may be the change in the debt thereafter brought about by the realization of the securities, provided only that the sums received by the creditor by way of dividends and from the amount collected

from the collaterals do not exceed the entire debt and therefore extinguish it.

I am constrained to dissent from these propositions, because, in my opinion, their enforcement will produce inequality among creditors and operate injustice, and, as a necessary consequence, are inconsistent with the National Banking Act.

It cannot be doubted that the acts of Congress, which regulate the collection and distribution of the assets of an insolvent national bank, are controlling. It is clear that every creditor who contracts with such bank does so subject to the provisions directing the manner of distributing the assets of such bank in case of its insolvency, and therefore that the terms of the act enter into and form part of every contract which such bank may make. Now, the act of Congress makes it the duty of the receiver appointed by the Comptroller to liquidate the affairs of a failed national bank, to take possession of and realize its assets, Rev. Stat. § 5234; to call, by advertisement for ninety days, upon creditors, to present and make legal proof of their claims, Rev. Stat. § 5235; and, from the proceeds of the assets, the Comptroller is directed to make a "ratable dividend" on the recognized claims, Rev. Stat. § 5236. To prevent preferences, the law, moreover, directs that all contracts from which preferences may arise, made after the commission of an act of insolvency or in contemplation thereof, "shall be utterly null and void." Rev. Stat. § 5242.

It seems to me superfluous to demonstrate that the rules now upheld by which a creditor holding security is decided to be entitled to disregard the value of his security and take a dividend upon the whole amount of the debt from the general assets, violates the principle of equality and ratable distribution which the act of Congress establishes. Is it not evident that if one creditor is allowed to reap the whole benefit of his security, and at the same time take from the general assets a dividend, on his whole claim, as if he had no security, he thereby obtains an advantage over the other general creditors, and that he gets more than his ratable share of the general assets? Let me illustrate the unavoida-

ble consequence of the doctrine now recognized. A loans a national bank $5000, and takes as the evidence of such loan a note of the bank for the sum named, without security. The lender is thus a general or unsecured creditor for the sum of $5000. B loans to the same bank $5000, without security. He is applied to for a further loan, and agrees to loan another $5000 on receiving collateral worth $5000, and requires that a new note be executed for the amount of both loans, which recites that it is secured by the collateral in question. While theoretically, therefore, B is a secured creditor for $10,000, he practically has no security for $5000 thereof. Insolvency supervenes. The general assets received by the Comptroller equal only fifty per cent of the claims. Now, under the rule which the court establishes, A on his unsecured claim of $5000 collects a dividend of but $2500, thereby losing $2500; B, on the other hand, who proves $10,000, taking no account whatever of his collateral, realizes by way of dividends $5000, and by collections on collaterals a similar amount, with the result that though as to $5000 he was, in effect, an unsecured creditor, he loses nothing. B is thus in precisely as good a situation as though he had originally demanded and received from the borrowing bank collateral securities equal in value to the full amount loaned. It is thus apparent that the application of the rule would operate to enable B — who, I repeat, virtually held no collateral security for $5000 of the sums loaned — to be paid his entire debt, though the assets of the insolvent estate of the borrower paid but fifty cents on the dollar, while another creditor holding an unsecured claim for $5000 fails to realize thereon more than $2500. Is it not plain that this result is produced by practically a double payment to B, that is, by recognizing B as a preferred creditor in the specific property, of the value of five thousand dollars, pledged to him, withdrawing that property from the general assets, and allowing B to solely appropriate it, yet permitting him, when the secured part of his debt is thus virtually satisfied, to *again assert* the same secured portion of the debt against other assets, by a claim upon the general fund in the hands of the receiver for the full amount

loaned. The consequence of the receipt of this extra sum upon account of the already fully secured portion of the original loan is that B is enabled to offset it against the deficient dividend on the unsecured portion of the debt, one equalling the other, thus closing the transaction without loss to him.

Let us suppose also the case of a creditor of a national bank who recovers a judgment for $100,000 and levies the same upon real estate of the bank worth only $50,000. While the legal title and possession is still in the bank a receiver is appointed and takes possession of the real estate. Certainly it cannot be contended that this judgment lien holder is not in equally as good a position as the holder of a mortgage lien or other collateral security. The doctrine of the court, however, if applied to the judgment lien holder, would authorize him to demand that the receiver treat the real estate as not embraced in the general assets, and that the creditor be allowed to enforce his whole claim against the other assets irrespective of the value of the specific security acquired by his lien.

That the doctrine maintained by the court also tends to operate a discrimination as between secured creditors, in favor of the one holding collateral securities not susceptible of prompt realization, is, I think, demonstrable. Thus a secured creditor who takes collaterals maturing on the same day with the debt owing to himself, which collaterals consist of negotiable notes, the makers of which and endorsers upon which are pecuniarily responsible, finds the collaterals promptly paid when deposited for collection, and if his debtor should become insolvent the day after payment the creditor could only claim for the residue of the debt still unpaid. On the other hand, a creditor of the same debtor, the debt to whom matures at the same time as that owing the other creditor, and is secured by collaterals also due contemporaneously, has the collaterals protested for non-payment, and when the debtor fails the collaterals have not been realized. While the first debtor, who had received first class collateral, can collect dividends against the estate of his insolvent debtor only for the unpaid portion of the claim, losing a part of such residue by the inability of the

estate to pay in full, the debtor who received poor collateral collects dividends out of the general assets on his whole claim, and if he eventually realizes on his securities may come out of the transaction without the loss of one cent. These illustrations, to my mind, adequately portray the inequality and injustice which must arise from the application of the rules of distribution now sanctioned by the court.

The fallacies which it strikes me are involved in the two propositions sanctioned by the court are these: First: The erroneous assumption that although the act of Congress contemplates that the dividend should be declared out of the general assets after the secured creditors have withdrawn the amount of their security, it yet provides that the secured creditor who has withdrawn his security and thus been *pro tanto* satisfied, can still assert his whole claim against the general assets, just as if he had no security and had not been allowed to withdraw the same. Second: The mistaken assumption that the act confers upon the secured creditor a new and substantial right, enabling him to obtain, as a consequence of the failure of the bank, an advantage and preference which would not have existed in his favor had the failure not supervened. This arises from holding that the insolvency fixed the amount of the claim which the secured creditor may assert, as of the time of the insolvency; thereby enabling him to ignore any collections which he may have realized from his securities after the failure, and permitting him to assert as a claim, not the amount due at the time of the proof, but, by relation, the amount due at the date of the failure, the result being to cause the insolvency of the bank to relieve the creditor holding security from the obligation to impute any collections from his collateral to his debt, so as to reduce it by the extent of the collections, a duty which would have rested on him if insolvency had not taken place. Third: By presupposing that, because before failure a secured creditor had a legal right to ignore the collaterals held by him and resort for the whole debt, in the first instance, against the general estate of his debtor, it would impair the obligation of the contract to require the secured creditor in case of insolvency

to take into account his collaterals and prevent him from asserting his whole claim, for the purpose of a dividend, against the general assets. But the preferential right arising from the contract of pledge is in nowise impaired by compelling the creditor to first exercise his preference against the security received from the debtor, and thus confine him to the specific advantage derived from his contract. Further, however, as the contract, construed in connection with the law governing it, restricts the secured as well as the unsecured creditor to a ratable dividend from the general assets, the secured creditor is prevented from enhancing the advantage obtained as a result of the contract for security, by proving his claim as if no security existed, since to allow him to so do would destroy the rule of ratable division, subject and subordinate to which the contract was made. A forcible statement of the true doctrine on the foregoing subject was expressed in the case of *Société Générale de Paris* v. *Geen*, 8 App. Cas. 606. The question before the court arose upon the construction to be given to a clause of the English bankrupt act of 1869, incidental to the requirement of a section, expressly embodied for the first time in a bankrupt act, that the secured creditor should in some form account for the collateral held by him in proving his claim against the general estate. In considering the restriction upon the remedy of a secured creditor produced by the insolvency, and the consequent right of such creditor to receive only a ratable dividend on the balance of the debt after the deduction of the value of the collaterals, Lord Fitzgerald said (p. 620):

"Under ordinary circumstances each creditor is at liberty to pursue at his discretion the remedies which the law gives him; but when insolvency intervenes, and the debtor is unable to pay his debts, the position of all parties is altered — the fund has become inadequate, and the policy of the law is to lead to equality. In pursuing that policy the bankrupt law endeavors to enforce an equal distribution, whilst it respects the rights of those who have previously, by grant or otherwise, acquired some security or some preferable right."

To resort, however, to reasoning for the purpose of en-

deavoring to demonstrate that where a statute does not allow preferences in case of insolvency, and commands a ratable distribution of the assets, a secured creditor · cannot be allowed to disregard the value of his security and prove for the whole debt, seems to me to be unnecessary, since that he cannot be permitted to so do, under the circumstances stated, has been the universal rule applied in bankruptcy in England and in this country from the beginning.

In the earliest English bankrupt act, 34 & 35 Hen. VIII, c. 4, the distribution of the general assets of the bankrupt was directed to be made, "for true satisfaction and payment of the said creditors; that is to say, to every of the said creditors, a portion rate and rate alike, according to the quantity of their debts." In the statute of 13 Eliz., c. 7, (and which was in force in this particular when the consolidated bankrupt statute of 6 Geo. IV, c. 16, was adopted,) the distribution of assets was directed in language similar to that just quoted from the statute of Henry VIII. Under these statutes, from the earliest times, it was held by the Lord Chancellors of England, having the supervision of the execution of the bankrupt statutes, that a secured creditor could not retain his collateral security and prove for his whole debt, but must have his security sold, and prove for the rest of the debt only. Lord Somers, in *Wiseman* v. *Carbonell*, (1695) 1 Eq. Cas. Ab. 312, pl. 9; Lord Hardwicke, in *Howel, petitioner*, (1737) 7 Vin. Ab. 101, pl. 13, and in *Ex parte Grove*, (1747) 1 Atk. 104; Lord Thurlow, in *Ex parte Dickson*, (1789) 2 Cox Ch. 194, and in *Ex parte Coming*, (1790) 2 Cox Ch. 225; Cooke's Bankrupt Laws, (1st ed. 1786) 114, and (4th ed. 1799) 119.

In 1794, 4 Brown's Ch. Rep. star paging 550, the prevailing practice with respect to a sale of a mortgage security was regulated by a general order formulated by Lord Chancellor Loughborough, wherein, among other things, it was provided that in case the proceeds of sale should be insufficient to pay and satisfy what should be found due upon the mortgage, " that such mortgagee or mortgagees be admitted a creditor or creditors under such commission for such deficiency, and to receive a dividend or dividends thereon out of the bankrupt's estate or

effects, ratably and in proportion with the rest of the creditors seeking relief under the said commission," etc.

Concerning the practice in bankruptcy, Lord Chancellor Eldon, in 1813, in *Ex parte Smith*, 2 Rose, 63, said: "The practice has been long established in bankruptcy, not to suffer a creditor holding a security to prove unless he will give up that security, or the value has been ascertained by the sale of it. The reason is obvious: Till his debt has been reduced by the proceeds of that sale, it is impossible correctly to say what the actual amount of it is. . . . It is, however, clearly within the discretion of the court to relax this rule, and cases may occur in which it would be for the benefit of the general creditors to relax it."

The first two bankrupt statutes enacted in this country (April 4, 1800, c. 19, 2 Stat. 19; August 4, 1841, c. 9, 5 Stat. 440) required a ratable distribution of the assets, and it was conceded in argument that the universal practice enforced under these acts was to require a creditor holding collateral security to deduct the amount of his security and prove only for the residue of the debt. This court, speaking through Mr. Justice Story, in 1845, in *In re Christy*, 3 How. 292, declared that under the act of 1841, "if creditors have a pledge or mortgage for their debt they may apply to the court to have the same sold, and the proceeds thereof applied towards the payment of their debts *pro tanto* and to prove for the residue."

As the universal rule and practice in bankruptcy in England and in this country, up to and including the bankrupt act of 1841, was solely the result of the statutory requirement that the assets should be ratably distributed among the general creditors, my mind fails to discern why the requirement for ratable distribution of the assets in the act for the liquidation of failed national banks, should not have the same meaning and produce the same result as the substantially similar provisions had always meant and had always operated in England for hundreds of years and in this country for many years before the adoption by Congress of the act for the liquidation of national banks. Indeed, the fact that the requirement of ratable distribution had by a long course of practice

and judicial construction in England and in this country required the secured creditor to account for his security, before proving against the general assets, gives rise to the application of the elementary canon of construction that where words are used in a statute, which words at the time had a settled and well-understood meaning, their insertion into the statute carries with them a legislative adoption of the previous and existing meaning.

The reasoning by which it is maintained that the requirement for ratable distribution should not be applied in the act providing for the liquidation of an insolvent national bank may be thus summed up: True it is, that universally in bankruptcy in England and in this country the rule was as above stated, but outside of bankruptcy a different practice prevailed in England, known as the chancery rule; and as the winding up of an insolvent national bank does not present a case of bankruptcy, its liquidation is governed by such chancery rule and not by the bankruptcy rule. The bankruptcy rule, it is said, is commonly so called because enforced by bankruptcy courts in the exercise of their "peculiar" jurisdiction, and the courts which refuse to apply the rule generally declare that it arose from express provisions in bankrupt statutes requiring a creditor to surrender his collaterals or deduct for their value before proving against the estate.

Pretermitting for a moment an examination of this reasoning, it is to be remarked in passing that the argument, if sound, rests upon the hypothesis that all the bankruptcy laws from the beginning in England and in our own country, and the universal course of decision thereon and the practice thereunder, have worked out inequality and injustice by depriving a secured creditor of rights which it is now asserted belonged to him and which could have been exercised by him without producing inequality. This deduction follows, for it cannot be that, if not to compel the creditor to deduct produces no inequality or injustice, then to compel him to do so would have precisely the same result. The two opposing and conflicting rules cannot both be enforced and yet in each instance equality result. At best, then, the contention admits that by

the consensus of mankind not to compel the secured creditor to deduct the value of his collaterals before proving produces inequality, for of all statutes those relating to bankruptcy have most for their object an equal distribution of the assets of the insolvent among his creditors.

It is worthy also of notice, in passing, that the reasoning to which we have referred rests upon the assumption that the act of Congress providing for the liquidation of the affairs of a national bank and a distribution of the assets thereof among the creditors is not substantially a bankrupt statute. It certainly is a compulsory method provided by law for winding up the concerns of an insolvent bank, for preventing preferences, and for securing an equal and ratable division of the assets of the association among its creditors. And it assuredly can be safely assumed that Congress in adopting the rule of ratable distribution in the National Banking Act did not intend that the words embodying the rule should be so construed as to produce a result contrary to that which for hundreds of years had been recognized as necessarily implied by the employment of similar language. It may also, I submit, be likewise considered as certain that it was not intended, in using the words "ratable distribution" in the statute, to bring about an unequal instead of a ratable distribution of the general assets.

But, coming to the proposition itself, is there any foundation for the assertion that the rule or practice in bankruptcy requiring the secured creditor to account for his security was the result of something peculiar in the jurisdiction of bankruptcy courts, other than the requirement contained in bankruptcy statutes that the assets should be distributed ratably among creditors, and is there any merit in the contention that the rule was the consequence of an express provision in such laws imposing the obligation referred to on the secured creditor?

A careful examination of every bankrupt statute in England, from the first statute of 34 & 35 Hen. VIII, c. 4, down to and including the Consolidated Bankrupt Act of 6 Geo. IV, c. 16, fails to disclose any provision sustaining the statement that

the rule in bankruptcy depended upon express statutory requirement, and on the contrary shows that it was simply a necessary outgrowth of the command of the statute that there should be an equal distribution of the bankrupt's assets.

I submit that not only an examination of the English statutes makes clear the truth of the foregoing, but that its correctness is placed beyond question by the statement of Lord Chancellor Eldon respecting proof in bankruptcy by a secured creditor, already adverted to, that ",till his debt has been reduced by the proceeds of that sale," (that is, of the security,) "it is impossible correctly to say what the actual amount of it is." And, as an authoritative declaration of the origin of the rule, the opinion of Vice Chancellor Malins, in *Ex parte Alliance Bank*, (1868) L. R. 3 Ch., note at page 773, is in point. The Vice Chancellor said:

"This rule" (requiring a creditor to realize his security and prove for the balance of the debt only) "does not depend on any statutory enactment, but on a rule in bankruptcy, established irrespective of express statutory enactment, and under the statute of *Elizabeth*, which provides: 'Or otherwise to order the same (*i.e.* the assets) to be administered for the due satisfaction and payment of the said creditors, that is to say, for every of the said creditors a portion, rate and rate alike, according to the quantity of his and their debts.'"

Indeed, not only was the obligation of the secured creditor to account for his security derived from the provision as to ratable distribution, but from that provision also originated the equally well-settled rule causing interest to cease upon the issuance of the commission of bankruptcy. As early as 1743, Lord Hardwicke, in *Bromley* v. *Goodere*, 1 Atkyns, 75, 79, in speaking of the suspension of interest by the effect of bankruptcy, said: "There is no direction in the act for that purpose, and it has been used only as the best method of settling the proportion among the creditors, that they may have a rate-like satisfaction, and is founded upon the equitable power given them by the act."

Whilst, generally, the claim that the bankruptcy rule was the creature of an express provision of the bankruptcy acts,

other than the requirement as to a ratable distribution of assets, rests upon a mere statement to that effect without any reference to the specific text of the bankrupt act which it was assumed made such requirement, in one instance, in the brief of counsel in an early case in this country, *Findlay* v. *Hosmer*, (1817) 2 Conn. 320, the statement is made in a more specific form. A particular section of an English bankrupt statute is there referred to, as, in effect, expressly requiring a secured creditor to account for his collaterals in order to prove against the general assets. The statute thus referred to was section 9 of 21 Jac. I, c. 19. But an examination of the section relied on shows that it in nowise supports the assertion. The pertinent portion of the section reads as follows:

" . . . all and every creditor and creditors having security for his or their several debts, by judgment, statute, recognizance, specialty with penalty or without penalty, or other security, or having no security, or having made attachments in London, or any other place, by virtue of any custom there used, of the goods and chattels of any such bankrupt, whereof there is no execution or extent served and executed upon any the lands, tenements, hereditaments, goods, chattels and other estate of such bankrupts, before such time as he or she shall or do become bankrupt, shall not be relieved upon any such judgment, statute, recognizance, specialty, attachments or other security for any more than a ratable part of their just and due debts, with the other creditors of the said bankrupt, without respect to any such penalty or greater sum contained in any such judgment, statute, recognizance, specialty with penalty, attachment or other security."

The securities other than attachment referred to in this section were manifestly embraced in the class known at common law as " personal " security, as distinguished from " real " security or security upon property. (Sweet's Dict'y English Law, *verbo* Security.) In other words, the effect of the section was but to forbid preferences in favor of creditors which at law would have resulted from the particular form in which the debt was evidenced, and from which form a claim would

be raised to a higher rank than a simple contract debt. That this is the significance of the word "security" as used in this section is shown by the following excerpt from Cooke's treatise on bankrupt laws, published in 1786. At page 114 he says:

"The aim of the legislature in all the statutes concerning bankrupts, being, that the creditors should have an equal proportion of the bankrupt's effects, creditors of every degree must come in equally; nor will the nature of, their demands make any difference, unless they have obtained actual execution, or taken some pledge or security before an act of bankruptcy committed. For when a creditor comes to prove his debt he is obliged to swear whether he has a security or not; and if he has, and insists upon proving, he must deliver it up for the benefit of his creditors, unless it be a joint security from the bankrupt and another person," etc.

The fact that the expression "security" contained in the section referred to had no reference to security on property, is further demonstrated by the subsequent statute of 6 Geo. IV, c. 9, § 103, which reënacted in an altered form the ninth section of the statute of James; for the reënacted section, although it referred in broad terms to securities generally, yet especially excepted the case of a mortgage or pledge. The section is as follows:

"Sec. 103. And be it enacted, That no creditor having security for his debt, or having made any attachment in London, or any other place by virtue of any custom there used, of the goods and chattels of the bankrupt, shall receive upon any such security or attachment more than a ratable part of such debt, except in respect of any execution or extent served and levied by seizure upon, or any mortgage of or lien upon any part of the property of such bankrupt before the bankruptcy."

Is it pretended anywhere that after the reënactment of section 9 of the statute of James I, found in section 103, c. 9, 6 Geo. IV, that the obligation of a secured creditor to account for his collateral before he took a dividend out of the general assets ceased to exist? Certainly, there is no such

contention. If, however, that duty of the general creditor arose, not from the provision as to ratable distribution, but from the provisions of section 9 of the act of James as claimed, then necessarily such obligation on the part of the general creditor would have ceased immediately on the enactment of the statute of 6 Geo. IV., which expressly excepted the mortgage creditor from the operation of the particular section which it is contended imposed the duty on the mortgage creditor to account. The continued enforcement of the rule which required the mortgage creditor to deduct the value of his security before proving against general assets after the reënactment of section 9 of the statute of George referred to, can lead to but one conclusion; that is, that the duty of the mortgage creditor before existing arose from the provision for ratable distribution and not from the terms of section 9 of the statute of James, since that duty continued to be compelled after the reënactment of that section in terms which renders it impossible to contend that that section created the duty.

A similar course of reasoning applies to bankrupt statutes of this country.

Section 31 of our first bankrupt statute, act April 4, 1800, c. 19, 2 Stat. 19, 30, was, in substance and effect, similar to the provision in the act of James. The statute of 1800 is said to have been a consolidation of the provisions of previous English bankrupt statutes, *Tucker* v. *Oxley*, 5 Cranch, 34, 42; *Roosevelt* v. *Mark*, 6 Johns. Ch. 266, 285; and in *Tucker* v. *Oxley*, Chief Justice Marshall declared that, for that reason, the decisions of the English judges as to the effect of those acts might be considered as adopted with the text that they expounded. Section 31 reads as follows:

"SEC. 31. And be it further enacted, That in the distribution of the bankrupt's effects, there shall be paid to every of the creditors a portion-rate, according to the amount of their respective debts, so that every creditor having security for his debt by judgment, statute, recognizance or specialty, or having an attachment under any of the laws of the individual States, or of the United States, on the estate of such bank-

rupt, (provided, there be no execution executed upon any of the real or personal estate of such bankrupt, before the time he or she became bankrupts) shall not be relieved upon any such judgment, statute, recognizance, specialty or attachment, for more than a ratable part of his debt, with the other creditors of the bankrupt."

This provision of the act of 1800 was, however, omitted from the bankrupt act of 1841, manifestly because it had become unnecessary. The later statute contained in the fifth section a general provision forbidding all preferences except in favor of two classes of debts, thus rendering it superfluous to enumerate cases in which there should be no preference. It was, however, under the act of 1841, which was drafted by Mr. Justice Story, (2 Story's Life of Story, 407,) that this court, speaking through that learned justice, in *In re Christy*, already cited, declared that a secured creditor must account for his security when proving against the bankrupt estate. How it can be now argued that the requirement that such creditor should only so prove his claim was the result of a provision not found in the act of 1841, and clearly shown by all the antecedent legislation not to refer to a creditor holding property security, my mind fails to comprehend.

True it is, that both in our own act of 1867 and in the English bankrupt act of 1869, there were inserted express provisions requiring a secured creditor to account for his collaterals before proving against the general assets. But this was but the incorporation into the statutes of the rule which had arisen as a consequence of the requirement for a ratable distribution and which had existed for hundreds of years before the statutes of 1867 and 1869 were adopted. In other words, the express statutory requirement only embodied in the form of a legislative enactment what theretofore from the earliest time had been universally enforced, because of the provision for a ratable distribution.

The rule in bankruptcy imposing the duty upon the creditor to account for his security before proving being then the result of the provision of the bankrupt laws requiring ratable distribution, I submit that the same requirements upon such

creditor should be held to arise from a like provision contained in the act of Congress under consideration.

But, coming to consider the chancery rule which it is contended lends support to the doctrines applied in the cases at bar.

The foundation upon which the so called chancery rule rests is the case of *Mason* v. *Bogg*, 2 Myl. & Cr. 443, decided in 1837, where Lord Chancellor Cottenham expressed his approval of the contention that a mortgage creditor, despite the death and insolvency of his debtor, possessed the contract right to assert his whole claim against general assets in the course of administration in chancery, without regard to his mortgage security. The question was not directly decided, however, as to whether the creditor might prove in the administration for the whole amount of the debt, but was reserved. As stated, however, the reasoning of the court favored the existence of such right, upon the theory that a court of chancery, when administering assets, *in the absence of a statute regulating the subject,* could not deprive a secured creditor of legal rights previously existing which he might have asserted at law, although by permitting the exercise of such rights preferences in the general assets would arise.

The next case in point of time in England, and indeed the one upon which most reliance is placed by those favoring the chancery rule, is *Kellock's case*, reported in L. R. 3 Ch. 769, involving two appeals, and argued before Sir W. Page Wood, L. J., and Sir C. J. Selwyn, L. J. The cases arose in the winding up of companies by virtue of the statute of 25 & 26 Victoria, c. 89. The issue presented in each case was whether a creditor having collateral security was entitled to dividends upon the full amount of the debt without reference to the value of collaterals; and in one of the cases the lower court applied the doctrine supported by the reasoning in *Mason* v. *Bogg*, while in the other the lower court decided the bankruptcy rule governed. The appellate court held that the chancery practice should be followed. The claim was made that the secured creditor ought not to be allowed to take a dividend on the full amount of his claim, because, among

other reasons, of section 133 of the act, which provided as follows:

"133. The following Consequences shall ensue upon the voluntary Winding-up of a Company:

"(1.) The Property of the Company shall be applied in satisfaction of its Liabilities *pari passu*, and, subject thereto, shall, unless it be otherwise provided by the Regulations of the Company, be distributed amongst the Members according to their Rights and Interests in the Company."

This contention, however, was answered by Lord Justice Wood, who said (p. 778):

"There is a clause in the Companies Act of 1862 which says that in a voluntary winding up equal distribution is to be made among creditors; an expression similar to which, in 13 Eliz. c. 7, appears to have led to the establishment of the rule in bankruptcy."

He then called attention to the fact that a voluntary winding up was not limited to cases of insolvent companies, but might be resorted to on behalf of a solvent one; and he proceeded to comment upon the fact that in previous winding-up acts, "when the legislature intended proceedings to be conducted according to the course in bankruptcy, it said so," concluding with the declaration that the omission to do so in the case before the court indicated the purpose of Parliament that the court should be governed by the chancery rule. Lord Justice Selwyn, in a measure, also adopted this view, saying (p. 782):

"I think, therefore, that the onus is clearly thrown on those persons who come here and say that when the legislature, with a knowledge of the existence of the difference between the practice in bankruptcy and the practice in chancery, entrusted the winding up of the companies to the Court of Chancery, and said in express terms that the practice of the Court of Chancery was to prevail, they intended by some implication or inference to diminish, prejudice or affect the rights of creditors. I can find no trace of any such intention. I think, therefore, we are bound to follow the established practice of the Court of Chancery, especially when we find that

that practice has been followed ever since the passing of the Winding-up Act, and so long as winding-up orders have been made in the Court of Chancery."

The whole subject has been set at rest, however, in Great Britain, by section 25 of the Judicature Act of August 5, 1873, c. 66, and by an amendment thereto adopted August 11, 1875, c. 77, which expressly required that in the administration in chancery of an insolvent estate of one deceased and in proceedings in the winding up of an insolvent company under the Companies Acts, "the same rule shall prevail and be observed as to the respective rights of secured and unsecured creditors, and as to debts and liabilities provable, . . . as may be in force for the time being under the law of bankruptcy, with respect to the estates of persons adjudged bankrupt."

So that now, in Great Britain, in all proceedings involving the distribution of an insolvent fund, a secured creditor can only prove for the balance which may remain after deduction of the proceeds or value of collateral security.

In view, therefore, of the English legislation in 1873 and 1875, which has rendered it impossible in cases of insolvency to apply the doctrine of the *Kellock case*, we need not particularly notice decisions rendered in England subsequent to 1868, when the *Kellock case* was decided, particularly as the tribunals which rendered such decisions were subordinate to the Court of Appeal and necessarily bound by its rulings.

Now, I submit, as the English Chancellors, from the date of the enactment of the earliest English bankrupt law, felt constrained to compel a secured creditor to account for his security before proving against the general assets of the bankrupt estate, because Parliament had directed a ratable distribution of all such assets, it cannot in consonance with sound reasoning be said that this court is to apply the chancery rule to the distribution of the assets of an insolvent national bank as to which Congress has directed a ratable distribution, because in England a different rule was for a time applied to an act of Parliament providing not solely for the liquidation of an insolvent estate, but equally to a solvent and

insolvent one, and which rule was so applied in England because a particular statute was construed as requiring that the practice pursued in chancery in administering upon estates should govern.

It is worthy of note that Lord Justice Wood, after stating in his opinion in the *Kellock case* that the bankruptcy rule was "adopted by a court having a peculiar jurisdiction, established for administering the property of traders unable to meet their engagements," conceded that the provision in the statute of 13 Eliz. c. 7, requiring equal distribution, "led to the establishment of the rule in bankruptcy." But the Lord Justice took the cases then under consideration out of the operation of the provision of the statute of Elizabeth because of provisions found in the Company Act which, in his opinion, gave rise to a contrary view in cases governed by that act. The distribution of the assets of a failed national bank under the act of Congress, it is obvious, presents the "peculiar" features which Lord Justice Wood had in mind, since the requirement of ratable distribution is the exact equivalent of the provision contained in the statute of Elizabeth. But the reasoning now employed to cause the rule announced in the *Kellock case* to apply so as to defeat the ratable distribution provided by the act of Congress, is made to rest upon the assumption that the act of Congress does not contain the peculiar requirement which was found in the bankruptcy acts, from which the duty of the secured creditor to account for his security before taking a dividend from the general assets arose. It comes, then, to this: That the theory by which the obsolete doctrine of the *Kellock case* is made to apply rests upon an assumption which repudiates the reasoning of that case; in other words, that the result of the *Kellock case* is taken and applied to this case, whilst the reasoning upon which the decision of the *Kellock case* was based is in effect denied.

That to permit a secured creditor to retain his specific contract security and also to prove against the general assets of his insolvent debtor for the whole amount of the debt was deemed to work out inequality is shown not only by the fact

that it was not applied in bankruptcy, but that in the administration of equitable, as contradistinguished from legal, assets, courts of equity, following the maxim *Equitas est quasi equalitas*, would not permit claimants against equitable assets to share in the distribution of such assets, until they had accounted for any advantage gained by the assertion against the general estate of the debtor of a preference permitted at law. *Morrice* v. *Bank of England*, Cases Temp. Talb. 218; *Sheppard* v. *Kent*, 2 Vern. 435; *Deg* v. *Deg*, 2 P. W. 412, 416; *Chapman* v. *Esgar*, 1 Sm. & G. 575; *Bain* v. *Sadler*, L. R. 12 Eq. 570; *Purdy* v. *Doyle*, 1 Paige, 558; *Bank of Louisville* v. *Lockridge*, 92 Kentucky, 472; 1 Story Eq. Jur. 12th ed. p. 543; Watson, 1 Comp. Ex. 2d rev. ed. ch. 11, p. 35.

It was undoubtedly from a consideration of this fundamental rule of equity, in construing the statutory requirement for ratable division of general assets, that the bankruptcy rule was formulated. That rule, however, in effect, declared that secured creditors might retain their preferential contract rights in particular portions of the estate of the insolvent debtor, but that it was the purpose of Parliament, in commanding ratable distribution, that general assets, that is, assets disencumbered of liens, should be distributed only among the general or unsecured creditors; the necessary effect being that a secured creditor could not prove against general assets without surrendering his security, thus becoming a general or unsecured creditor *for the whole amount of the debt*, or realizing upon the security or in some form accounting for its value, in which latter contingency he would be general or unsecured creditor only *for the deficiency*. That the bankruptcy rule was deemed to be founded upon equitable principles, I think, is demonstrated by the statement of Lord Hardwicke in a case already mentioned, *Bromley* v. *Goodere*, 1 Atk. 77, where, after referring to the act of 13 Eliz. c. 7, he said:

"It is manifest that this act intended to give the commissioners an equitable jurisdiction as well as a legal one, for they have full power and authority to take by their discretions such order and direction as they shall think fit; and that this has

been the construction ever since; and therefore when petitions have come before the Chancellor, he has always proceeded upon the same rules, as he would upon causes coming before him upon the bill, *The rules of equity.*"

The foregoing reasoning renders it unnecessary to review at length the opinion delivered by the Circuit Court of Appeals for the Sixth Circuit in *Chemical National Bank* v. *Armstrong*, 16 U. S. App. 465, to which the court has referred, as the conclusions announced by the Circuit Court of Appeals were rested on the assumption that the bankruptcy rule was the creature of an express statutory requirement, and that to prevent a secured creditor from proving for his whole debt, as of the time of the insolvency, without regard to his collaterals, would deprive him of a contract right, both of which contentions have been fully considered in what I have already said. Nor is the case of *Lewis* v. *United States*, 92 U. S. 619, also referred to in the opinion of the court in the case at bar, controlling upon the question here presented. True, it was said in the *Lewis case*, in passing, and upon the admission of counsel, that "It is a settled principle of equity that a creditor holding collaterals is not bound to apply them before enforcing his direct remedies against the debtor;" citing the *Kellock case* and two other English and two Pennsylvania cases involving the question of the rights of a creditor having the securities of distinct estates of separate debtors. But the controversy before the court in the *Lewis case* was of this latter character, being between the United States, as creditor of a partnership and holding collaterals belonging to the partnership, and the trustee in bankruptcy of the separate estates of individual members of the partnership. The government was seeking to assert against such separate estates a right of preference given to it by statute. The court decided that as the United States had a paramount lien upon all the assets of every debtor for the full satisfaction of its claim, it was unaffected by the bankruptcy statutes, and therefore was not controlled by any provision found therein for ratable distribution or otherwise. It is apparent, therefore, that the court, by the quoted statement did not decide that a court of equity

would apply the doctrine there set forth, where the rights of the secured creditor were limited and controlled by statute. If the secured creditor, who is allowed in the case now decided to disregard his security and prove for the whole amount of his claim had a paramount lien not only upon his collaterals, but upon each and every asset of the insolvent bank, the rule in the *Lewis case* would be apposite. But that is not the character of the case now before the court, since here a secured creditor has no paramount lien upon anything but his collaterals, and is governed in his recourse against the general assets by the requirement that there should be a ratable distribution.

As the case before us is to be controlled by the act of Congress, it would appear unnecessary to advert to state decisions construing local statutes; but inasmuch as those decisions were referred to and cited as authority, I will briefly notice them. They are referred to in the margin and divide themselves into four classes: 1. Those which maintain that where ratable distribution is required, the creditor must account for his security before proving.[1] 2. Those cases which, on the contrary, decide that to allow the creditor to prove for his whole claim without deduction of security, is not incompatible with ratable distribution, and hold that the security need not be taken into account.[2] 3. Those cases which, whilst seemingly deny-

---

[1] *Amory* v. *Francis*, (1820) 16 Mass. 308; *Farnum* v. *Boutelle*, (1847) 13 Met. 159; *Vanderveer* v. *Conover*, (1838) 1 Harr. 487; *Bell* v. *Fleming's Executors*, (1858) 1 Beasley, (12 N. J. Eq.) 13, 25; *Whittaker* v. *Amwell National Bank*, (1894) 52 N. J. Eq. 400; *Fields* v. *Creditors of Wheatley*, (1853) 1 Sneed, (Tenn.) 351; *Winton* v. *Eldridge*, (1859) 3 Head, (Tenn.) 361; *Wurtz* v. *Hart*, (1862) 13 Iowa, 515; *Searle*, *Ex'or*, v. *Brumback, Assignee*, (1862) 4 Western Law Monthly, (Ohio) 330; *In re Frasch*, (1892) 5 Wash. 344; *National Union Bank* v. *National Mechanics Bank*, (1895) 80 Maryland, 371; *American National Bank* v. *Branch*, (1896) 57 Kansas, 327; *Investment Co.* v. *Richmond National Bank*, (1897) 58 Kansas, 414.

[2] *Findlay* v. *Hosmer*, (1817) 2 Conn. 350; *Moses* v. *Ranlet*, (1822) 2 N. H. 488; *West* v. *Bank of Rutland*, (1847) 19 Vermont, 403; *Walker* v. *Baxter*, (1854) 26 Vermont, 710, 714; *In the matter of Bates*, (1886) 118 Illinois, 524; *Furness* v. *Union National Bank*, (1893) 147 Illinois, 570; *Levy* v. *Chicago National Bank*, (1895) 158 Illinois, 88; *Allen* v. *Danielson*, (1887) 15 R. I. 480; *Greene* v. *Jackson Bank*, (1895) 18 R. I. 779; *People* v. *Remington*,

ing the obligation of the secured creditor to account for his security, yet, practically, work out a contrary result by requiring deduction upon collaterals as collected, and affording remedies to compel prompt realization of collaterals.[1] 4. Those which originated in purely local statutes and which hold that the secured creditor can prove for the whole amount without reference to either the bankruptcy or the chancery rule.[2] And in the margin I supplement the compilation heretofore made by a reference to some state statutes and decisions referring to statutes which expressly provide that the claimants upon an insolvent estate can only prove for the balance due, after deduction of any security held.[3]

Of course, for the purposes of this case, only the first two classes of cases need be considered. The first class is well represented by two Massachusetts cases: *Amory* v. *Francis*, 16 Mass. 308, and *Farnum* v. *Boutelle*, 13 Met. 159. In the first-named case Chief Justice Parker said (p. 311): "If it were not so, the equality, intended to be produced by the

---

(1890) 121 N. Y. 328; *Third National Bank of Detroit* v. *Haug*, (1890) 82 Michigan, 607; *Kellogg* v. *Miller*, (1892) 22 Oregon, 406; *Winston* v. *Biggs*, (1895) 117 N. C. 206.

[1] *In re Estate of McCune*, (1882) 76 Missouri, 200; *State* v. *Nebraska Savings Bank*, (1894) 40 Nebraska, 342; *Jamison* v. *Alder-Goldman Commission Co.*, (1894) 59 Arkansas, 548, 552; *Philadelphia Warehouse Co.* v. *Anniston Pipe Works*, (1895) 106 Alabama, 357; *Erle* v. *Lane*, (1896) 22 Colorado, 273.

[2] *Shunk's and Freedley's Appeals*, (1845) 2 Penn. St. 304; *Morris* v. *Olwine*, (1854) 22 Penn. St. 441, 442; *Keim's Appeal*, (1856) 27 Penn. St. 42; *Miller's Appeal*, (1860) 35 Penn. St. 481; *Patten's Appeal*, (1863) 45 Penn. St. 151. And see a reference to the cases in Pennsylvania, in *Boyer's Appeal*, (1894) 163 Penn. St. 143.

[3] Indiana: — *Combs* v. *Union Trust Co.*, 146 Ind. 688, 691; Kentucky: — Statutes, 1894, (Barbour & Carroll's ed.) c. 7, sec. 74, p. 193; *Bank of Louisville* v. *Lockridge*, 92 Kentucky, 472; Massachusetts: — Act of April 23, 1838, c. 163, sec. 3; General Statutes, 1860, ch. 118, sec. 27; Michigan: — 2 How. St. sec. 8824, p. 2156; Minnesota: — By statute March 8, 1860, the security is made the primary fund, to which resort must be had before a personal judgment can be obtained against the debtor for a deficit, *Swift* v. *Fletcher*, 6 Minn. 550; New Hampshire: — Laws 1862, ch. 2594; South Carolina: — *Piester* v. *Piester*, 22 S. C. 139; *Wheat* v. *Dingle*, 32 S. C. 473; Texas: — Civil Stats. 1897, art. 83; Acts 1879, ch. 53, sec. 13; *Willis* v. *Holland*, (1896) 36 S. W. Rep. 329.

bankrupt laws, would be grossly violated, and the creditor holding the pledge would, in fact, have a greater security than that pledge was intended to give him. For originally it would have been security only for a portion of the debt equal to its value; whereas by proving the whole debt, and holding the pledge for the balance, it becomes security for as much more than its value, as is the dividend, which may be received upon the whole debt."

In the later case, Chief Justice Shaw announced the rule as follows: 13 Met. 164:

"If the mortgage remained in force at the time of the decease of the debtor, then it is very clear, as well upon principle as authority, that the creditors cannot prove their debt, without first waiving their mortgage, or, in some mode, applying the amount thereof to the reduction of the debt, and then proving only for the balance. *Amory* v. *Francis*, 16 Mass. 308."

The second class of cases may be typified by the case of *People* v. *Remington*, 121 N. Y. 328, where the conclusion of the court was placed upon the ground that the rule in bankruptcy originated in an express requirement in the bankrupt acts other than that for a ratable distribution. The court, speaking through Gray, J., said (p. 332):

"Some confusion of thought seems to be worked by the reference of the decision of the question to the rules of law governing the administration of estates in bankruptcy; but there is no warrant for any such reference. The rules in bankruptcy cases proceeded from the express provisions of the statute, and they are not at all controlling upon a court administering, in equity, upon the estates of insolvent debtors. The bankruptcy act requires the creditor to give up his security, in order to be entitled to prove his whole debt; or, if he retains it, he can only prove for the balance of the debt, after deducting the value of the security held. The jurisdiction in bankruptcy is peculiar and special, and a particular mode of administration is prescribed by the act."

Having thus eliminated the bankruptcy rule, the court reviewed the decisions in *Mason* v. *Bogg* and *Kellock's case*, and held those cases to be controlling. The *Remington case*,

therefore, as well as those of which it is a type, need not be further reviewed, as the fundamental error upon which they rest has been fully stated in what I have previously said.

It is necessary, however, to call attention to the fact that in the cases which decline to apply the rule in bankruptcy and refuse to enforce the provision for ratable distribution, there is an entire want of harmony as to the time when the rights of creditors are fixed with respect to the amount of the claim which may be proved against general assets, some holding that dividends are to be paid on the amount due at the date of insolvency, others on the amount due at the time of proof; and others upon the sum due when dividends are declared. This confusion is the necessary outcome of the erroneous premise upon which the cases rest. A similar confusion, moreover, I submit, is manifested by the rule now announced by the court; since whilst it is avowedly rested upon the defunct chancery rule exemplified in *Mason* v. *Bogg* and the *Kellock case*, yet in effect it fails to follow the very rule upon which the decision is based. This is clear when it is borne in mind that the chancery rule was decided in both *Mason* v. *Bogg* and the *Kellock case* to be that the amount of the claim of the creditor was fixed by the date when proof was actually made, and yet under the authority of the chancery rule and the cases in question the court now decides that the rights of the secured creditor are fixed by insolvency. Thus the chancery rule is applied and at the same time repudiated in an important particular, for the grave difference between allowing a secured creditor to prove only for the amount due when proof was made and therefore compelling him to account for all collections realized on collaterals up to that time, and allowing him long after insolvency to prove, by relation, as of the date of the insolvency, and disregard the collections actually made, is manifest. In this connection it may not be amiss to call attention to the fact that if the bankruptcy rule was applied in the proof of claims, the amount of the claim would not vary, whether the date of insolvency or the time when proof was made was held to be the date when the rights of the creditor in the fund were fixed.

Moreover, I submit that the propositions now adopted, which reject the bankruptcy rule, rest on reasoning which, if it be logically applied, requires the enforcement of the bankruptcy rule in its integrity. It seems to me it has been shown by the doctrine announced by Lord Hardwicke, in 1743, *Bromley* v. *Goodere, supra*, that the stoppage of interest on the claims of all creditors was but an essential evolution of the principle of ratable distribution. This stoppage of interest at the period named is now upheld by the rule sanctioned by this court. This, then, takes the provision of the bankruptcy rule which favors the secured creditor and which arises alone from ratable division, and gives him the benefit of it whilst at the same time rejecting the obligation to account which arises from and depends on the very principle of ratable distribution which is in part enforced. To repeat, it strikes my mind that the conclusion now announced is this, that the obsolete chancery rule both applies and does not apply, that the bankruptcy rule at the same time does not apply and does apply, the result of this conflict being to so interpret the act of Congress as to strike from it the beneficent provision for equality of distribution among general creditors.

MR. JUSTICE GRAY dissenting.

While also unable to concur in the opinion of the majority of the court, I prefer to rest my dissent upon the effect of the legislation of Congress, read in the light of the English statutes and decisions before the American Revolution, and of the judgments of the courts of the United States — without particularly considering the cases in England in recent times, or the conflicting decisions made in the courts of the several States under local statute or usage or upon general theory. As the course of reasoning in support of this view traverses part of the ground covered by the other dissenting justices, I shall endeavor to state it as shortly as possible.

The English bankrupt acts in force at the time of the Declaration of Independence, so far as they touched the distribution of a bankrupt's estate among his creditors, were the

statute of 13 Eliz. (1571) c. 7, § 2, which directed the estate to be applied to the " true satisfaction and payment of the said creditors, that is to say, to every of the said creditors a portion, rate and rate like, according to the quantity of his or their debts;" and the statute of 21 James I, (1623) c. 19, § 8 (or § 9), which made more specific provisions against allowing any creditors, whether " having security" or not, to prove " for any more than a ratable part of their just and due debts with the other creditors of the said bankrupt." As appears on the face of this provision, the word " security" was evidently there used, not as including a mortgage or other instrument executed by the debtor by way of pledging part of his property as collateral security for the payment of a debt, but merely as designating a bond or writing which was evidence of the debt itself as a direct personal obligation; and the objects of the provision would appear to have been to put all debts, whether by specialty or by simple contract, upon an equal footing in the ratable distribution of a bankrupt's estate, and to permit the real amount only of any debt, and not any larger sum named in a bond or other specialty, to be proved in bankruptcy. 4 Statutes of the Realm, 539, 1228; 2 Cooke's Bankrupt Laws, (4th ed.) [18] [33]; 1 Ib. 119; Bac. Ab. Obligations, A; 3 Bl. Com. 439.

Neither of those statutes contained any provision whatever for deducting the value of collateral security and proving the rest of the debt. Yet, from the earliest period of which there are any reported cases, it was uniformly held — without vouching in any provision of the bankrupt acts, other than those directing a ratable distribution among all the creditors — and had long before the American Revolution become the settled practice in the Court of Chancery, that a creditor could not retain collateral security received by him from the bankrupt and prove for his whole debt, but must have his collateral security sold and prove for the rest of the debt only. The authorities upon this point are collected in the opinion of Mr. Justice White, *ante*, 153.

After the American Revolution, the provision of the statute of James I was thrice reënacted, with little modification.

Stats. 5 Geo. IV, (1824) c. 98, § 103; 6 Geo. IV, (1825) c. 16, § 108; 12 & 13 Vict. (1849) c. 106, § 184.   But the rule established by the decisions and practice of the Court of Chancery, as to the proof of secured debts, was never expressly recognized in any of the English bankrupt acts until 1869, when provisions to that effect were inserted in the statute of 32 & 33 Vict. c. 71, § 40.   And there is no trace of a different rule in England, in proceedings in equity for the distribution of the estate of any insolvent debtor or corporation, until more than sixty years after the Declaration of Independence.   *Amory* v. *Francis*, (1820) 16 Mass. 308, 311; *Greenwood* v. *Taylor*, (1830) 1 Russ. & Myl. 185; *Mason* v. *Bogg*, (1837) 2 Myl. & Cr. 443. In 1868, indeed, the Court of Chancery declined to apply the bankruptcy rule to proceedings under the winding-up acts. *Kellock's case*, L. R. 3 Ch. 769.   But Parliament, by the Judicature Acts of 1873 and 1875, applied that rule to such proceedings.   Stats. 36 & 37 Vict. c. 66, § 25 (1); 38 & 39 Vict. c. 77, § 10.   And Sir George Jessel, M. R., has pointed out the absurdity of having different rules in the cases of living and of dead bankrupts.   *In re Hopkins*, (1881) 18 Ch. D. 370, 377.

The first bankrupt act of the United States, enacted in 1800, was in great part copied from the earlier bankrupt acts of England, and condensed the provisions, above mentioned, of the statutes of Elizabeth and of James I, in this form: "In the distribution of the bankrupt's effects, there shall be paid to every of the creditors a portion-rate, according to the amount of their respective debts, so that every creditor having security for his debt by judgment, statute, recognizance or specialty, or having an attachment under any of the laws of the individual States, or of the United States, on the estate of such bankrupt, (provided there be no execution executed upon any of the real or personal estate of such bankrupt, before the time he or she became bankrupts,) shall not be relieved upon any such judgment, statute, recognizance, specialty or attachment, for more than a ratable part of his debt with the other creditors of the bankrupt."   Act of April 4, 1800, c. 19, § 31; 2 Stat. 30.   That provision must have received the

same construction that had been given by the English judges to the statutes therein reënacted. *Tucker* v. *Oxley*, (1809) 5 Cranch, 34, 42; *Scott* v. *Armstrong*, (1892) 146 U. S. 493, 511.

The bankrupt act of 1841, which is well known to have been drafted by Mr. Justice Story, omitted that section, and made no specific provision whatever as to the proof of secured debts; but simply provided that " all creditors coming in and proving their debts under such bankruptcy, in the manner hereinafter prescribed, the same being *bona fide* debts, shall be entitled to share in the bankrupt's property and effects, *pro rata*, without any priority or preference whatsoever, except only for debts due by such bankrupt to the United States, and for all debts due by him to persons who, by the laws of the United States, have a preference, in consequence of having paid moneys as his sureties, which shall be first paid out of the assets." Act of August 19, 1841, c. 9, § 5; 5 Stat. 444.

Yet Mr. Justice Story, both in the Circuit Court and in this court, laid it down, as an undoubted rule, that a secured creditor could prove only for the rest of the debt, after deducting the value of the security given him by the bankrupt himself of his own property. *In re Babcock*, 3 Story, (1844) 393, 399, 400; *In re Christy*, (1845) 3 How. 292, 315.

The omission by that eminent jurist, when framing the act of 1841, of all specific provisions on the subject as unnecessary, and his repeated judicial declarations, after he had been habitually administering that act for three or four years, recognizing that rule as still in force, compel the inference that a general enactment for the ratable distribution of the estate of an insolvent among all the creditors had the effect of preventing any individual creditor, while retaining collateral security on part of the estate, from proving for his whole debt.

In 1864, Congress, in the first national bank act, after providing for the appointment of a receiver with power to convert the assets of any insolvent national bank into money and pay it to the treasurer of the United States, subject to the order of the comptroller of the currency, further provided that " from time to time the comptroller, after full provision shall

have been first made for refunding to the United States any such deficiency in redeeming the notes of such association as is mentioned in this act, shall make a ratable dividend of the money, so paid over to him by such receiver, on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction." Act of June 3, 1864, c. 106, § 50; 13 Stat. 115.

The words of this act, requiring "a ratable dividend" to be paid "on all claims" proved or adjudicated, are equivalent to the words of the last preceding bankrupt act, directing that "all creditors coming in and proving their debts" "shall be entitled to share" in the estate "*pro rata*, without any priority or preference whatsoever;" and, in view of the judicial construction which had been given to that act, may reasonably be considered as having been intended by Congress to have the same effect of preventing a creditor, secured on part of the estate, from proving his whole debt without relinquishing or applying the security, although neither act specifically so provided.

If such was the rule under the national bank act of 1864, it could not be affected, as to national banks, by the express affirmance of the rule in the bankrupt act of 1867, or by the reënactment of the provisions of each of these two acts in the Revised Statutes. And the extension of the bankrupt act of 1867 to "moneyed business or commercial corporations and joint stock companies" increases the improbability that Congress intended banking associations to be governed by a different rule from that governing other private corporations, as well as natural persons, in regard to the effect which a creditor's holding collateral security should have upon the sum to be proved by him against an insolvent estate. Act of March 2, 1867, c. 176, §§ 20, 37; 14 Stat. 526, 535; Rev. Stat. §§ 5075, 5236.

Reliance has been placed upon the remark of Mr. Justice Swayne in *Lewis* v. *United States*, 92 U. S. 618, 623, that "it is a settled principle in equity that a creditor holding collaterals is not bound to apply them before enforcing his direct remedies against the debtor." But he added, "This

is admitted," so that it is evident that the point was not controverted by counsel, or much considered by the court. Nor was it necessary to the decision, which had nothing to do with the right of an individual creditor, holding security upon the separate property of the debtor, to prove against his estate in bankruptcy; but simply affirmed the right of the United States, holding a debt against an English partnership, to prove the whole amount of the debt against one of the partners, an American, in proceedings in bankruptcy here under the act of 1867, without surrendering or accounting for collateral security given to the United States by the partnership. The United States were not bound by the bankrupt acts, nor subject to the rule of a ratable distribution, but were entitled to preference over all other creditors. *United States* v. *Fisher*, 2 Cranch, 358; *Harrison* v. *Sterry*, 5 Cranch, 289; *United States* v. *State Bank*, 6 Pet. 29; *United States* v. *Herron*, 20 Wall. 251. And, even as to a private creditor, it has always been held that he is obliged to account for such securities only as he holds from the debtor against whose estate he seeks to prove; and that a creditor proving against the estate of a partnership is not bound to account for security given to him by one partner, nor a creditor proving against the estate of one partner to account for security given him by the partnership. *Ex parte Peacock*, (1825) 2 Glyn & Jameson, 27; *In re Plummer*, (1841) 1 Phil. Ch. 56; *Rolfe* v. *Flower*, (1866) L. R. 1 P. C. 27, 46; *In re Babcock*, 3 Story, 393, 400. To require a creditor, before proving against the estate of one partner, to surrender to the assignee of that estate security held from the partnership, would be to add to the separate estate property which should go to the estate of the partnership.

The ground and the limits of the rule in bankruptcy were clearly stated by Lord Chancellor Lyndhurst in *Plummer's case*, above cited, in which a partnership creditor was allowed to prove a partnership debt against the separate estate of each partner, without surrendering or realizing security held by him from the partnership. The Lord Chancellor said: " Now what are the principles applicable to cases of this kind? If

a creditor of a bankrupt holds a security on part of the bankrupt's estate, he is not entitled to prove his debt under the commission, without giving up or realizing his security. For the principle of the bankrupt laws is, that all creditors are to be put on an equal footing, and therefore, if a creditor chooses to prove under the commission, he must sell or surrender whatever property he holds belonging to the bankrupt; but if he has a security on the estate of a third person, that principle does not apply; he is in that case entitled to prove for the whole amount of his debt, and also to realize the security, provided he does not altogether receive more than twenty shillings in the pound. That is the ground on which the principle is established; it is unnecessary to cite authorities for it, as it is too clearly settled to be disputed; but I may mention *Ex parte Bennet*, 2 Atk. 527; *Ex parte Parr*, 1 Rose, 76; and *Ex parte Goodman*, 3 Maddock, 373; in which it has been laid down. The next point is this. In administration under bankruptcy, the joint estate and the separate estate are considered as distinct estates; and accordingly it has been held that a joint creditor, having a security upon the separate estate, is entitled to prove against the joint estate without giving up his security; on the ground that it is a different estate. That was the principle upon which *Ex parte Peacock* proceeded, and that case was decided first by Sir John Leach and afterwards by Lord Eldon, and has since been followed in *Ex parte Bowden*, 1 Deacon & Chitty, 135. Now this case is merely the converse of that, and the same principle applies to it." - 1 Phil. Ch. 59, 60.

This court, under the existing national bank act, approving and following the example of the English courts under the statute of 13 Elizabeth, above cited, has allowed creditors to set off, against their claims on the estate, debts due from them to the debtor whose estate is in course of distribution, although the statute in question in either case contained no provision directing or permitting a set-off. *Scott* v. *Armstrong*, 146 U. S. 493, 511. In giving effect to a statute which simply directs an equal and ratable distribution of a debtor's estate among all creditors, without saying anything about either col-

lateral security or set-off, there would seem to be quite as much ground for requiring each creditor to account for his collateral security, for the benefit of all the creditors, as for allowing him the benefit of a set-off, to their detriment.

For the reasons thus indicated, I cannot avoid the conclusion that, under every act of Congress directing the ratable distribution among all creditors of the estate of an insolvent person or corporation, and making no special provision as to secured creditors, an individual creditor, holding collateral security from the debtor on part of the estate in course of administration, is not entitled to a dividend upon the whole of his debt, without releasing the security or deducting its value; and that therefore the judgment of the Circuit Court of Appeals should be reversed.