UNITED STATES FIDELITY & GUARANTY CO.
v. MALIA, Bank Com'r, for Use and Benefit of
CREDITORS OF PROVO COMMERCIAL
& SAVINGS BANK, et al.

No. 5589.   Decided October 7, 1935.   (49 P. [2d] 954.)

*Ingebretsen, Ray, Rawlins & Christensen,* of Salt Lake City, for appellant.

*Dan B. Shields,* of Salt Lake City, for respondents.

EPHRAIM HANSON, Justice.

Plaintiff in its complaint alleged in substance as follows: That because of the insolvency of the Provo Commercial & Savings Bank, the defendant banking commissioner took charge of its business and assets March 2, 1933; that on February, 1931, the plaintiff entered into an agreement of suretyship with the treasurer of the state of Utah, whereby plaintiff agreed to pay to the said treasurer up to $15,000 in the event the said bank failed, upon demand, to pay the funds which were deposited therein by said treasurer; that said agreement was in full force and effect when said bank closed its doors on March 2, 1933; that when said bank closed said treasurer had on deposit therein the sum of $45,848.71, and, as security therefor, said bank had pledged United States 3 per cent treasury bonds of the face value of $35,000; that in addition the state treasurer was protected by a surety bond issued by plaintiff; that in May, 1933, with the consent of the defendants, the state treasurer

sold the United States treasury bonds and received the sum of $33,772.97 net therefor; that on June 26, 1933, said state treasurer made formal demand upon plaintiff for payment in accordance with the terms of said surety bond, and on September 20, 1933, plaintiff paid said treasurer the sum of $12,075.74, being the amount of the demand, and also paid the sum of $224.15 accrued interest thereon; that in consideration of said payments said treasurer assigned to plaintiff all claims which he held against said bank, arising from his said deposit, which it was claimed included his claims for dividends on the entire amount of the $45,848.71 deposit, a copy of said assignment being attached to the complaint; that on April 28, 1933, said treasurer made claim against defendants for the payment of his claim in the sum of $45,848.81, and said claim was rejected by defendants July 17, 1933. Plaintiff prayed judgment requiring defendants to recognize its claim in the sum of $45,848.71 and to pay dividends to plaintiff pro rata with other depositors on the basis of the amount of said claim until plaintiff was paid in full the amount of $12,075.74.

To this complaint defendants filed a general demurrer, alleging that the complaint did not state facts sufficient to constitute a cause of action. The lower court sustained the demurrer. The plaintiff elected to stand on said complaint, whereupon the action was dismissed by the court on motion of defendants. Plaintiff appeals from the judgment of dismissal and assigns as error the sustaining of the demurrer and the dismissing of plaintiff's action as being against the admitted facts and contrary to law.

The sole question presented by this appeal is whether plaintiff, as assignee of the claim of the state treasurer against the defendant as liquidator of said bank, is entitled to dividends based upon the amount of the treasurer's deposit at the time the bank closed its doors, namely, $45,-848.71, until it is paid the sum of $12,075.74, being the principal amount paid by plaintiff to the said treasurer under its bond, or whether plaintiff is entitled to receive divi-

dends only on the said sum of $12,075.74; the state treasurer having held security and having received payment on his claim in the sum of $33,772.97 as a result of selling said security.

The plaintiff contends for the first proposition and relies upon those authorities which have adopted the so-called equity or chancery rule. The defendants contend for the second proposition and argue that the matter should be decided by applying what is commonly known as the bankruptcy rule.

In the case of *Merrill* v. *National Bank of Jacksonville*, 173 U. S. 131, 19 S. Ct. 360, 362, 43 L. Ed. 640, these two rules are stated as follows:

Equity rule: "The creditor can prove for, and receive dividends upon, the full amount of his claim, regardless of any sums received from his collateral after the transfer of the assets from the debtor in insolvency, provided that he shall not receive more than the full amount due him."

Bankruptcy rule: "The creditor desiring to participate in the fund is required first to exhaust his security, and credit the proceeds on his claim, or to credit its value upon his claim, and prove for the balance, it being optional with him to surrender his security and prove for his full claim."

The question here on appeal has been before many of the courts of this country. The resulting decisions have been, from the beginning, in irreconcilable conflict, some adopting one view and some the other, while yet some courts have adopted certain variations thereof. A collection of the cases which have passed upon the matter under consideration may be found in the note in L. R. A. 1918B, at page 1024, in 3 Michie on Banks and Banking, pp. 216-219, and in 7 Corpus Juris, 750.

In the case of *Merrill* v. *National Bank of Jacksonville*, supra, is contained an exhaustive and scholarly review of the history of the various rules and a statement of the fundamental principles underlying them. The court was divided five to four, the majority adopting the equity or

chancery rule and the minority the bankruptcy rule. It could serve no useful purpose for us to attempt an extended analysis of the authorities and the views expressed by them. The matter being one of first impression with us, we are concerned chiefly with the adoption of that rule which to our minds will most nearly impart equity and fair dealing in the liquidation and in the distribution of the assets of defunct banking institutions and give effect to whatever legislative intent in that regard which may be found expressed in our statutes.

R. S. Utah 1933, c. 2, tit. 7, provides for the suspension and liquidation of banking institutions. Section 7-2-15 provides that "no preferences or priorities shall be given to any claim," except those incurred in liquidating the affairs and those otherwise provided by law. This section enumerates certain claims which are to be given preference and provides that such claims shall be paid in full before "any payment shall be made upon the claims of depositors and other general creditors of such bank." Plaintiff could succeed only to whatever rights the state treasurer had as a depositor in the defunct bank. There is nothing in the nature of plaintiff's claim which would bring it within any of the preferences enumerated by the statute. Under section 7-2-16, in liquidating the claims against the bank, the bank commissioner "may, out of the funds remaining in his hands after the payment of expenses, declare one or more *ratable* dividends." (Italics ours.) The clear import of these sections is to fix equality in the treatment of claims and in the declaration of dividends thereon. In no other way could ratable dividends be declared, there being no exceptions provided for.

Aside from the principle of equality thus expressed in our statutes, such principle should be applied as a matter of equity and fair dealing. Indeed, the courts have not hesitated to apply such principle without reference to any statutory provisions. After a careful consideration of the matter, we are of the opinion that

the equality which our statutes contemplate and which natural justice and equity would dictate will be best assured and administered by the application of the so-called bankruptcy rule to the situation now before us. Under that rule, in practical effect, the secured creditor must first exhaust his security and apply the proceeds or value thereof upon his claim and can participate only upon the basis of the balance thus remaining after giving such credit.

It seems to us that the application of the rule contended for by plaintiff would result in inequality and injustice as between secured and unsecured creditors and between secured creditors. Such rule would withdraw from the assets of the debtor the pledged assets so far as payment of all other debts is concerned, but give no corresponding credit or offset therefor on the claim itself in so far as the basis of its right to participate in the remaining assets is concerned, leaving the debt, for that purpose, precisely as if no security had been given and no assets had been segregated to the debt. While the unsecured creditors have no claim upon the pledged assets, yet the secured creditor is permitted to retain such assets and also participate with the other creditors in what remains on the basis of his whole claim. Thus he would be receiving dividends upon the amount already paid him or available to him alone from that part of the debtor's estate held by him as security. In the present case plaintiff would receive dividends on the $33,772.97 already paid in cash in addition to dividends upon the unpaid balance. This might well result in plaintiff receiving payment in full on the deposit involved while other creditors might only receive a fractional part of their deposits, all resulting from the mere fact that plaintiff's assignee had a certain amount of security covering his deposit.

Further, the equity or chancery rule would place the secured creditor in a more favorable position than he would have been had no insolvency intervened before realizing on

his security. Under R. S. Utah 1933, 104-55-1, there can be but one action on a secured debt. Before the secured creditor can resort to the personal liability of the debtor and subject his general assets to the payment of his claim, he must first exhaust his security, and he can only proceed to collect against the debtor any balance thereafter remaining unpaid with no better rights than any unsecured creditor would have. *National Bank* v. *James Pingree Co.*, 62 Utah 259, 218 P. 552, and cases there cited. Under the equity rule such creditor, having realized on his security before insolvency occurred, could only make claim upon the insolvent for the deficiency. Why should the time of insolvency enlarge his rights? He could not ignore the security before insolvency, and proceed to collect from the debtor's general assets any part of his debt. Why should he be entitled to ignore the security after insolvency for the purpose of participating in such assets?

It is argued that the difference arises from the fact that the amount of the claim to which he is entitled is fixed as of the time insolvency occurs, and that, therefore, the claim should be proved and dividends apportioned thereon based upon that amount. Such contention, however, ignores the fact that, while the amount owing is fixed as of the time of insolvency, yet there is segregated and set apart for application upon such claim the collateral given by the debtor. Because of the insolvency the debtor cannot pay his debts and there can be no payment in the ordinary course of business. The whole aspect is changed, and neither debtor nor creditor is at liberty to pursue their respective rights and remedies. The debtor's assets are turned over to his creditors for division. The secured creditor receives his security to apply on his debt and his claim is thus reduced. As to any balance he must look to the general assets along with the general creditors and such balance actually becomes the amount which the insolvent owes. The mere fact that the creditor at one time had security ought not to give him any different standing in

relation to the general assets than would be given him had he been a strictly unsecured creditor. He should be entitled to participate in the remaining estate of the insolvent to the extent only that the debt thus remaining unpaid would entitle him. To that extent only has he a claim upon the personal liability of the insolvent.

The inequalities among creditors which would result from the equity rule and the reasons why it should not be followed are so clearly and fully stated by Justice White in his dissenting opinion in the case of *Merrill* v. *National Bank of Jacksonville*, supra, that we refer the reader to that opinion without attempting a further discussion of the matter. Summarizing his arguments against the holding of the majority opinion in applying the equity rule, Justice White states that the fallacies involved in that holding are:

"First. The erroneous assumption that, although the act of congress contemplates that the dividends should be declared out of the general assets after the secured creditors have withdrawn the amount of their security, it yet provides that the secured creditor who has withdrawn his security, and thus been pro tanto satisfied, can still assert his whole claim against the general assets, just as if he had no security, and had not been allowed to withdraw the same. Second. The mistaken assumption that the act confers upon the secured creditor a new and substantial right, enabling him to obtain, as a consequence of the failure of the bank, an advantage and preference which would not have existed in his favor had the failure not supervened. This arises from holding that the insolvency fixed the amount of the claim which the secured creditor may assert as of the time of the insolvency, thereby enabling him to ignore any collections which he may have realized from his securities after the failure, and permitting him to assert as a claim, not the amount due at the time of the proof, but, by relation, the amount due at the date of the failure; the result being to cause the insolvency of the bank to relieve the creditor holding security from the obligation to impute any collections from his collateral to his debt, so as to reduce it by the extent of the collections, —a duty which would have rested on him if insolvency had not taken place. Third. By presupposing that, because before failure a secured creditor had a legal right to ignore the collaterals held by him, and resort for the whole debt, in the first instance, against the general estate of his debtor, it would impair the obligation of the contract to require the secured creditor in case of insolvency to take into account

his collaterals, and prevent him from asserting his whole claim, for the purpose of a dividend, against the general assets. But the preferential right arising from the contract of pledge is in no wise impaired by compelling the creditor to first exercise his preference against the security received from the debtor, and thus confine him to the specific advantage derived from his contract. Further, however, as the contract, construed in connection with the law governing it, restricts the secured as well as the unsecured creditor to a ratable dividend from the general assets, the secured creditor is prevented from enhancing the advantage obtained as a result of the contract for security by proving his claim as if no security existed, since to allow him to so do would destroy the rule of ratable division, subject and subordinate to which the contract was made."

From what has been said and from the view of the question which we take, it follows that the state treasurer, having security for his deposit and having fixed the value thereof by sale and having received the benefit thereof, was bound to give credit for the amount so received upon the amount thus remaining unpaid. The plaintiff, assignee, could succeed to no greater or other rights.

The judgment of the lower court, therefore, is affirmed, with costs to the respondent.

ELIAS HANSEN, C. J., and FOLLAND, MOFFAT and WOLFE, JJ., concur.