From Charles K. Derr, Reading.

## Essick et al. v. Bauman Iron Works

*Elwood Deysher, Leonard G. Yoder,* and *Russell H. Yoder,* for exceptants.

*Stevens & Lee* and *John H. Bertolet,* contra.

SHANAMAN, J., March 9, 1936.—The receiver of the Bauman Iron Works filed his first and partial account, which was referred to Abraham H. Rothermel, Esq., for audit. Some of the creditors of the Bauman Iron Works have filed exceptions to the auditor's findings and awards in their respective claims, and these, after argument, are before us for determination.

Coco Metalcraft Corporation excepts to the auditor's disallowance of a claim of $245.56. This claim is for an unpaid balance on an account, arising out of a contract between the Bauman Iron Works and the exceptant. Under the contract claimant, as subcontractor, constructed bronze handrails for the balustrades on the stairways of the Pratt Library in Baltimore, Maryland. The contract price was $945.56, of which $700 was paid. When the balustrades were erected it was found that a number of the bronze rails did not fit over the iron rails, or templets, which they were to cover. The Bauman Iron

Works had to reheat the bronze rails and bend them to proper shape before the Pratt Library would accept the work. There was evidence that this reworking upon the bronze rails was performed by the Bauman Iron Works at a cost of $661.90, and there was testimony, pro et contra, in an effort to place the blame for the faulty construction. The auditor found that the faulty construction of the bronze rails was the fault of the claimant, and disallowed its claim. We have carefully read and reread the testimony, and are not satisfied that by the fair weight of the credible evidence claimant performed its contract properly and without fault. Since the burden is on claimant to establish its claim we must disallow it, dismiss its exception to the auditor's disallowance, and sustain the said finding of the auditor.

The auditor also found that the Bauman Iron Works has overpaid the claimant in the amount of $416.34 and is entitled to reimbursement for the correction of the bronze rails. Exception is taken to this finding. Since the auditor was not appointed or empowered to try and adjudicate any right that the receiver may possess to recover damages or money paid in excess from the claimant, the auditor's finding that the Bauman Iron Works is entitled to be reimbursed for the correction of the bronze rails is overruled and vacated and the exception to that finding is sustained.

The remaining exceptions concern the claim of the Penn National Bank & Trust Company for $65,296.09. This claim is made up of principal and interest on a number of promissory notes of varying amounts. The bank held certain securities for the payment of the notes. The question at issue is whether the bank may claim for the whole amount of the debt and recover a dividend thereon, equally with unsecured creditors upon their respective claims, or whether the securities held by the bank must be deducted from the total amount of its claim and the dividend awarded only upon the unsecured remainder. The auditor has upheld the latter con-

tention, and, after deducting the amount of the securities, finds that the unsecured remainder is $9,987.59, and has awarded a dividend thereon. To this finding the bank has excepted.

As security for the payment of one of the notes, which is the direct note of the Bauman Iron Works for $35,000, dated January 30, 1933, the bank holds a mortgage on the plant of the Bauman Iron Works which was originally executed in the sum of $50,000 and was reduced before the appointment of the receiver to $35,000. The bank has not delivered this mortgage to the receiver. The auditor has valued it at $35,000 and no exception has been taken to that valuation, the parties having agreed upon $35,000 as the fair value of the mortgage with its accompanying bond.

The bank also held as collateral security for the payment of certain others of the notes, namely, one for $9,034, one for $7,000, and one for $9,250, several life insurance policies on the life of Robert L. Kift, aggregating $70,000, under a life insurance trust agreement dated July 28, 1932. Robert L. Kift died on June 25, 1933, and the bank, as trustee under said trust agreement, collected the net sum of $69,573.25. Under the terms of the trust agreement the bank was authorized to reimburse itself for a note held by it against Robert L. Kift in the sum of $47,000, plus interest thereon amounting to $1,856.50, and for insurance premiums paid by the bank on the life insurance policies, amounting to $408.25. The balance under the trust agreement, namely $20,308.50, was to be applied by the bank to the payment of the three notes in the sums respectively mentioned above of $9,034, $7,000, and $9,250, in the order named. This balance, agreed upon by the bank and the receiver after the payment of the personal note of Robert L. Kift and other charges, was $20,308.50. Under the terms of the trust agreement it became the duty of the bank to apply this sum as follows: namely, to the payment in full of the note for $9,034 and of the note

for $7,000, and to the payment of a remainder of $4,274.01 on account of the note for $9,250. Thus there was a balance due and unpaid on the note for $9,250, which was found by the auditor to amount to $4,975.99. Certain other notes on which the Bauman Iron Works is liable, held by the bank, total $5,000.60, making a total indebtedness not secured by any collateral, including $11 protest fees, of $9,987.59.

The auditor held the proceeds of the insurance policies to be an existing collateral security for the debt, a view which did not affect his decision. The point is, however, of importance, in the event that the auditor's enforcement of the so-called "bankruptcy rule" should ultimately be determined to have been erroneous. We have therefore carefully considered the nature of the proceeds of the policies and are of opinion that, whatever rule may be ultimately applied to the distribution, the bank's claim must first be diminished by the net proceeds applicable thereto, to wit, by the amount of $20,308.50, for the reason that the bank's claim must be considered to have been liquidated, paid and settled in said amount and that the bank cannot be considered as having held or as now holding the proceeds as collateral security for the full amount of the notes even though it did hold the policies themselves as such security.

When the receiver was appointed on March 3, 1933, the bank held the policies as collateral security for the payment of the notes. Kift, the insured, died on June 25, 1933. Under the so-called "equity rule", the bank could apply the proceeds to the debt and still claim upon the whole amount of it, unless the contract under which it held the policies and received their proceeds created an equity adverse to such right; "that right rested not on general laws disposing of the property of insolvent debtors, dead or alive, but on the contract of the parties": Fulton's Estate, 65 Pa. Superior Ct. 437, 442.

The contract between the parties in the present case was the trust agreement, by the terms of which the bank, in addition to holding the policies as collateral security, undertook as follows:

". . . and upon receipt of the proceeds of said policies the Trustee shall pay therefrom to Penn National Bank and Trust Company of Reading, Pennsylvania, the sums of money to it owing at the time of grantor's demise as principal and interest upon the several promissory notes mentioned in the Schedule hereto annexed and marked Exhibit 'A' . . . and any and all renewals of said promissory notes in the sequence in which said notes appear in said Schedule, grantor's liability as endorser or as guarantor of said notes under a collateral guaranty to be regarded as his personal indebtedness and as due, owing and payable by grantor to the holder of said notes at and from the date of endorsement and guaranty without requiring protest thereof, and the Trustee shall pay the balance of said insurance moneys not required for the payment hereinbefore and hereinafter specified, to the person or persons named in an addendum hereafter to be attached hereto, or if the grantor should fail to thus designate such person or persons, then the Trustee shall pay the balance of said insurance moneys to the Executors or Administrators of the grantor . . ."

It follows that the bank was obligated to use the proceeds to pay on and upon the notes, and, on the other hand, Kift or his personal representatives could demand that this be done, if no contrary equities should appear. Inasmuch as the notes at the time of Kift's death and thereafter have never been reduced to such an amount that the entire proceeds of the policies would suffice to pay the notes in full, it follows that none of the proceeds remained to be distributed to Kift's personal representatives, and from that fact it further follows that the bank at the time of the death and thereafter has at all times been a trustee solely for itself, subject to its engagement to pay the proceeds upon and in reduction of the debt.

Since the bank had, therefore, both the legal and equitable title to the proceeds and possession thereof, and since no contrary interest appears, the notes, in view of the bank's engagement to pay the proceeds upon them, must be taken in equity to have been paid pro tanto by the receipt of the insurance proceeds. Therefore, the bank's claim must be reduced by the amount of $20,308.50. The amount actually due the bank is therefore $44,987.59. The seventh exception of the receiver to the auditor's seventh finding of fact is therefore sustained.

The so-called "bankruptcy rule" forbids a partially secured creditor to claim for the whole of his debt when seeking to share a common dividend out of funds intended by the receiver for distribution to the common creditors. The rule limits such a creditor to the receipt of a dividend upon that portion of his claim which is in excess of the value of his security. This rule the auditor applied. The bank, exceptant, contends that he should have applied the so-called "equity rule", under which the secured creditor may receive a dividend upon the whole of his claim, provided, however, that he shall in no case receive, as a result of such dividend plus the proceeds of his security, a greater amount than his actual claim. Although the Pennsylvania authorities in some cases have applied the "equity rule", we are of opinion that in the present state of the authorities the "bankruptcy rule" must be applied in a case such as the present and that the exceptions to the auditor's report in that respect must be dismissed.

The auditor, in his learned and able discussion, admitted that the line of decisions in the Pennsylvania Supreme Court throughout the nineteenth century upheld and enforced the "equity rule". In Miller's Appeal, 35 Pa. 481, a debtor executed a general assignment of all his estate in trust for the benefit of his creditors; subsequently the assignor became entitled to a legacy, which was attached and recovered by one of the creditors for whose benefit the assignment had been made. It was held

that such creditor was, nevertheless, entitled to a dividend out of the assigned estate on the whole amount of his claim at the time of the execution of the assignment. In Patten's Appeal, 45 Pa. 151, vendors of goods sold had detained a part of the goods upon the insolvency of and assignment for the benefit of creditors by the vendee; the vendors sold the detained part and applied the proceeds to the payment of notes given upon the sale, leaving a balance still due. It was held that they were entitled to a dividend upon the whole amount of their claim at the date of the assignment: Brough's Estate, 71 Pa. 460; Graeff's Appeal, 79 Pa. 146 (here the security was upon real estate) ; and Miller's Estate, 82 Pa. 113, accord.

The Supreme Court of the United States adopted the same rule in Merrill v. National Bank of Jacksonville, 173 U. S. 131, citing Miller's Appeal. A vigorous dissent was filed by four of the nine justices. The majority opinion, which spoke for the court, limited its decision to jurisdictions which had not by statute or judicial decision adopted a different rule. The auditor in the present case refused to follow the Pennsylvania cases above cited, on the ground that the subsequent passage of the Pennsylvania Insolvency Act of June 4, 1901, P. L. 404, sec. 28, 39 PS §90, enacted the "bankruptcy rule" and that the law in Pennsylvania now fell for that reason within the exception recognized by the majority decision in the Jacksonville case, supra. It is true that the Pennsylvania Insolvency Act adopts the "bankruptcy rule" in proceedings in insolvency brought under and in accordance with its provisions. The present proceeding, however, is not under that act but is a receivership in equity of an insolvent corporation.

No case has been found in the appellate courts of Pennsylvania where the point has been raised in a receivership proceeding in equity of an insolvent corporation. In that respect we are confronted with the same situation that arose in United Security Trust Company's Case, 117 Pa. Superior Ct. 429, 433, where the Superior Court

stated that none of the cases applying the "equity rule" dealt with a depositor's claim against an insolvent bank. Miller's Appeal, 35 Pa. 481, one of the earliest decisions that enforced the "equity rule", arose upon a debtor's assignment for the benefit of creditors. Neither this case nor Morris v. Olwine, 22 Pa. 441, nor like cases in the books, would be decided today as they were decided, for the reason that the Act of 1901, supra, has changed the relevant law. It would seem, therefore, that said act has, at least to the extent of cases arising under it, brought the law of Pennsylvania within the exception indicated by the decision in Merrill v. National Bank of Jacksonville, supra.

A survey of the appellate decisions in Pennsylvania since 1901 reveals, however, that Miller's Appeal supra, and Morris v. Olwine, supra, are still cited for the "equity rule": see Chambersburg Trust Co. v. Alexander, 102 Pa. Superior Ct. 158, and United Security Trust Company's Case, supra. It should be noted, however, that while the "equity rule" was stated in these cases to be etablished it was not applied in either of them, in the former the court rightly holding that the point did not arise because the debt had actually been paid pro tanto before the fund came into being, and in the latter the court expressly applying the "bankruptcy rule" upon grounds of the peculiar relation of banker and depositor. In the only other germane case since the Act of 1901, supra, in the appellate courts, Fulton's Estate, supra, the Superior Court enforced the "equity rule" in an orphans' court distribution of the estate of an insolvent decedent. In one lower court decision brought to our attention, Hamilton et al. v. Pittsburgh Physicians Supply Co., 64 Pitts. 667, the court in a receivership of an insolvent corporation applied the "equity rule".

In the absence of any appellate authority directly on the point, we are unable to agree that the exception to the auditor's application of the "bankruptcy rule" should be sustained. Through the passage of the Federal Bank-

ruptcy Act of July 1, 1898, 30 Stat. at L. 544, and of the Pennsylvania Insolvency Act, supra, it seems to us to be clear that it is the legislative intent of both the Federal and the State Governments that, in distributing the estates of insolvents, the "bankruptcy rule" should be enforced. In principle no sound reason can be found why a different rule should prevail in distributing the estate of an insolvent in the course of ordinary equity receivership proceedings. The respective advantages and disadvantages of either rule have been frequently expounded, but the Act of 1901, supra, by changing the law as to the very cases, above cited, on which the "equity rule" was founded, has in our opinion indicated a policy which we should, in the absence of any specific authority to the contrary, follow and enforce: see Brock's Assigned Estate (No. 2), 312 Pa. 18, 25, wherein our Supreme Court expressly referred to the fact that Miller's Appeal, supra, was decided before the passage of the Act of 1901, supra. This appears to be the only reference to the point under discussion which we have been able to find in any decision of our Supreme Court since 1901. That the Bauman Iron Works was insolvent, and that the principal object of the receivership was the administration of the estate of an insolvent, is clear. The rule in Fulton's Estate, supra, of course, remains the established law in orphans' court distribution.

The bank cites United States Brick Co., to use, v. Middletown Shale Brick Co. et al., 228 Pa. 81, 86, for the proposition that "the jurisdiction exercised by courts of equity in the appointment of receivers is essentially unlike and serves different objects from that created by insolvency and bankruptcy statutes, and remains unaffected by these."

This language must, of course, be read and understood in connection with the facts and the thing decided in that case. So viewed we observe nothing in the last five words of the quotation to prevent the application of a rule ex-

pressly favored by the statute law in a case not governed by an exact judicial precedent to the contrary:

"The effect of the appointment of a receiver by a court of equity under its general chancery powers is to place the property from that time in the custody of the receiver as an officer of the court for the benefit of the parties ultimately proved to be entitled": 53 C. J. 93, sec. 117.

The appointment of a receiver does not transfer to him the legal title to the assets of which he takes custody. "He has always been regarded, not as having the legal right, but as a mere custodian": Yeager v. Wallace, 44 Pa. 294, 296.

"The effect of the appointment of a receiver is to remove the parties to the suit from the possession of the property, but at the same time the right to the property is in no way affected by such appointment and the receiver merely holds the property as a custodian for the benefit of him who may be ultimately entitled to it": Commonwealth, ex rel., v. Overholt, 23 Pa. Superior Ct. 199, 201.

It is questionable therefore whether the ruling principle that the creditors of an assigned estate are the owners of it, on which Miller's Appeal, supra, and cases like it were decided prior to the passage of the Pennsylvania Insolvency Act of 1901, supra, could apply to an estate in receivership. Even if we were to hold that the bank in the instant case became a co-owner of the assets at and through the appointment of a receiver, we are always confronted by section 28 of the Insolvency Act, which has rejected the "equity rule" in the characteristic case where prior to that act the principle was notably applied.

We are of opinion that exceptions 3, 4, 5, and 7 of the bank should be dismissed. The other exceptions involving the same point need not be specifically ruled. The bank's exceptions are dismissed. A dividend should be awarded to the bank, as ordered by the auditor, upon the net remainder of its claim, after deducting the value of

its collateral mortgage security, which has been agreed to be $35,000. The net amount on which dividends should at this time be allowed is, therefore, as found by the auditor, $9,987.59. In view of our foregoing decision it becomes unnecessary to determine the validity of the further contention raised by the receiver of the Bauman Iron Works, that an equity in favor of the application of the "bankruptcy rule" arises from what took place at the hearing of December 16th. We take occasion to observe, however, that the record reveals that counsel for the said receiver stated at the same hearing that he had been unable to come to any agreement with counsel for the bank.

And now, to wit, March 9, 1936, the first, second, and third exceptions of Coco Metalcraft Corporation are dismissed, and its fourth and fifth exceptions are sustained. The seventh exception of the receiver of Bauman Iron Works to the auditor's seventh finding of fact is sustained. The said receiver's other exceptions are dismissed. The exceptions of William H. McGowan, receiver of Penn National Bank & Trust Company, are dismissed. From Charles K. Derr, Reading.