In re BELL & BECKWITH, Debtor.

Mary L. McKENNY, Executrix of the Estate of Charles A. McKenny; Mary L. McKenny (90–3434), Plaintiffs–Appellants,

Marie P. Schedel, Executrix of the Estate of Joseph J. Schedel (90–3454), Intervenor–Appellant,

v.

Patrick A. McGRAW, Trustee; Securities Investor Protection Corporation, Defendants–Appellees.

Nos. 90–3434, 90–3454.

United States Court of Appeals, Sixth Circuit.

Argued May 9, 1991.

Decided July 1, 1991.

Louis J. Hattner, Richard E. Wolff, Spengler, Nathanson, Heyman, McCarthy & Durfee, Toledo, Ohio, and Frank C. Razzano (argued), Shea & Gould, Washington, D.C., for plaintiffs-appellants.

Mary Ann Whipple, Fuller & Henry, Toledo, Ohio, and Stephen P. Harbeck (argued) and Theodore H. Focht, Washington, D.C., for defendants-appellees.

John W. Rozic and Charles E. Brown, Brown, Baker, Schlageter & Craig, Toledo, Ohio, for intervenor-appellant.

Before KENNEDY and MARTIN, Circuit Judges, and ENGEL, Senior Circuit Judge.

KENNEDY, Circuit Judge.

Plaintiffs Mary L. McKenny and the Estate of Charles A. McKenny appeal the District Court's affirmance of the bankruptcy court's judgment dismissing their complaints under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"). Intervening plaintiff Schedel ap-

peals the District Court's judgment dismissing her appeal as untimely. Plaintiffs allege that the trustee's proposed distribution scheme violates the distribution scheme and priorities established by SIPA. For the following reasons, we AFFIRM.

## I.

### A.

On February 5, 1983, Bell & Beckwith ("debtor"), a securities broker-dealer, declared bankruptcy and became subject to liquidation pursuant to SIPA. Among the debtor's customers at the time of bankruptcy were Charles and Mary McKenny ("McKennys" or "plaintiffs"), a husband and wife who maintained several separate accounts. During the course of the bankruptcy proceedings, the McKennys filed a six-count complaint raising, among other issues, the question of whether the trustee's proposed distribution scheme violated SIPA. Marie Schedel ("Schedel"), Executrix of the Estate of Joseph Schedel, a customer of the debtor at the time of bankruptcy, was permitted to intervene and joined with the McKennys in attacking the trustee's proposed distribution scheme. The Bankruptcy Court granted the trustee's motion for summary judgment that the proposed distribution did not violate SIPA.

The McKennys and Schedel appealed this decision to the District Court. Schedel's appeal was dismissed as untimely. The District Court addressed the McKennys' appeal on the merits and affirmed the decision of the Bankruptcy Court. *In re Bell & Beckwith*, 104 B.R. 842 (Bankr.N.D.Ohio 1989). The McKennys now bring this appeal and ask this Court to review the District Court's decision upholding the validity of the trustee's proposed distribution scheme. Schedel appeals the decision of the District Court to dismiss her appeal as untimely.

### B.

The facts relevant to this appeal are not in dispute. The debtor was a stock brokerage firm in Toledo, Ohio, managed by Edward Wolfram, Jr. ("Wolfram"), starting in approximately 1973. Over a period of ten years, Wolfram embezzled cash and securities held by the debtor totaling more than $40,000,000.00 before discovery by the Securities Exchange Commission in February of 1983.

The McKennys opened separate accounts with the debtor in the 1950's. All of the McKennys' accounts were cash accounts. Immediately prior to the debtor filing for bankruptcy, Mr. McKenny maintained one account with a net equity of $3,582,560.31; Mrs. McKenny maintained two accounts, one personal ("personal account") and one for which she was the designated payee ("payee account"), with net equities of $3,527,289.18 and $101,356.19, respectively. The combined net equities of these accounts totaled $7,211,205.68.

On February 5, 1983, the Securities Investor Protection Corporation ("SIPC") filed an application for a protective decree in district court. This application was granted and, following the appointment of a trustee, plaintiffs and other aggrieved customers of debtor filed claims with respect to each of their accounts. The trustee, using SIPC funds, made advances to these claimants. Charles and Mary filed separate claims and received cash and securities totaling $499,957.50 and $499,962.50, respectively, based on the net equities of their personal accounts. No advance was made for Mary McKenny's payee account. These advances reduced the McKennys' aggregate net equity to $6,261,285.68.

On July 23, 1984, after pooling relevant assets into a customer property fund, the trustee received permission from the bankruptcy court to make a partial distribution from such fund. The bankruptcy court allowed SIPC to participate in this distribution to the extent a customer was "overpaid," that is, to the extent that the total monies received by a customer based on the aggregate of advances by the SIPC and distributions from the customer property fund exceeded the "net equity" of such customer's account. As a result of this distribution, the McKennys received an aggregate amount of $4,434,891.49. Combining this amount with the previous ad-

vances, the McKennys' accounts remained unsatisfied by approximately $1,776,314.19.

The trustee then sought to distribute $4,500,000 from the customer property fund. Under this proposal, SIPC again would be allowed to participate in the distribution in the same manner and to the same extent as in the initial distribution. If this money were distributed only to unsatisfied claimants, the McKennys' claims would be fully satisfied; with SIPC's participation, the McKennys only receive 79% of their claims. Plaintiffs unsuccessfully contested the proposed distribution scheme in the courts below and now ask this Court to exclude SIPC from partaking in this distribution until all of the remaining customers' claims are fully satisfied.

## II.

In order to understand properly the issues in this case, a brief review of SIPA is necessary. In 1970, Congress, responding to serious financial problems in the securities industry, passed the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* The goals of this legislation were twofold: to establish a reserve fund to protect customers of brokers-dealers; and to strengthen the financial responsibilities of brokers-dealers. H.R.Rep. No. 1613, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 5254, 5257 [hereinafter House Report]. Thus, one primary purpose of SIPA was to "provide for the establishment of a fund to be used to make it possible for the public customers in the event of the financial insolvency of their broker, to recover that to which they are entitled, with a limitation of $50,000 for each customer on the amounts to be provided by the proposed fund." *Id.* at 5255.[1]

To achieve this end, SIPA created the Security Investor Protection Corporation, a nonprofit membership corporation comprised of all brokers and dealers registered under section 15(b) of the Securities Exchange Act of 1934 with some exceptions. 15 U.S.C. § 78ccc. SIPA requires members of SIPC to pay an assessment based on a percentage of their gross revenues from their securities businesses in order to create a fund to provide protection for investors against losses caused by broker-dealer insolvencies. *Id.* § 78ddd(c); House Report at 5258.

Upon the occurrence of a triggering event stated in SIPA, a court, based on a motion by SIPC, may issue a protective order and appoint a trustee in order to liquidate the debtor. 15 U.S.C. § 78eee. At this time the amount of each customer's claim is ascertained. The amount of each claim is based upon the "net equity" in a customer's account which is equal to the dollar value of each separate account less any amount owed to the debtor plus any amount repaid by the customer to the broker with the trustee's approval. *Id.* § 78*lll* (11).

Customers' claims are satisfied from two sources: distributions from the customer property fund and SIPC monies. Both SIPA and its legislative history make clear the manner in which claims are satisfied from these sources. Certain property as defined by SIPA is pooled into a customer property fund in which customers share ratably. SIPC is liable to the extent the customer property fund is insufficient to satisfy customers' claims up to a maximum of $500,000 per customer.

Implementing this statutory scheme is complicated by the congressional requirement that SIPC make prompt payments to customers. These payments take the form of advances which are used to satisfy customer claims:

> SIPC would advance to the trustee such sums from the SIPC fund as would be necessary to provide for prompt payment of claims of customers of the debtor, but only to the extent of [$500,000] for each customer. This significant provision will make it possible for public customers to receive promptly that to which they are entitled without the delay entailed in waiting for the liquidation proceeding to be completed. In addition, and subject to the limitation of [$500,000, of which not

---

**1.** The amount of this protection has since been increased to $500,000. 15 U.S.C. § 78fff–3(a).

more than $100,000 may be in satisfaction of a claim based on cash], public customers of the broker-dealer would receive back 100 percent of that to which they are entitled.

House Report at 5262; 15 U.S.C. § 78fff–3. SIPC makes such advances prior to a determination of each customer's ratable share of or distribution from the customer property fund. This sequence of payments— SIPC advances prior to pro rata calculations or distributions from the customer property fund—creates the possibility that a customer's pro rata share from such fund, when combined with any advances made by SIPC, will exceed the amount of a customer's claim.

The instant dispute centers on this problem of overpayments. In other words, what happens to the excess if customers receive more than the amount of their claims based on the aggregate of advances from SIPC and their pro rata shares of the customer property fund? Not surprisingly, plaintiffs argue that it should be used to further reduce any customers' claims that remain unsatisfied. SIPC argues that it should receive this excess to the extent such customer received an advance from SIPC.

Plaintiffs point to several provisions to support their position that SIPC cannot recapture any of its advances until all customers' claims are satisfied. Section 78fff–2(c)(1) establishes priorities for the allocation of assets in the customer property fund:

(A) first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff–3(c)(1) of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to section 78fff(d) of this title;

(B) second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;

(C) third, to SIPC as subrogee for the claims of customers;

(D) fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff–3(c)(2) of this title.

15 U.S.C. § 78fff–2(c).[2] Further, section 78fff–3(a) provides that "SIPC as subrogee may assert no claim against customer property until after allocation thereof to customers as provided in section 78fff–2(c) of this title." Plaintiffs argue that this language indicates that SIPC cannot receive any funds resulting from overpayments unless all customers' claims have been fully satisfied.

Plaintiffs assert that SIPA effectuates its allocation scheme by requiring a ratable distribution of customer property only to those claimants who remain unsatisfied after SIPC advances. A customer whose claim has been satisfied should no longer be considered in subsequent pro rata calculations. Only unsatisfied claimants are to be considered in the calculation, foreclosing the possibility of an overpayment to a customer and the recapture of any funds by SIPC.

On the other hand, defendants contend and the lower courts held that a calculation of ratable shares of the customer property fund must include all customers' claims whether or not such customers' claims have been fully satisfied by virtue of previous SIPC advances. Defendants proffer several reasons to support the inclusion of all customers' claims when calculating pro rata shares which we consider persuasive.

First, the statutory language and legislative history of SIPA clearly indicate an intent to limit SIPC's exposure. Section 78fff–3(a) limits SIPC's exposure to "the amount by which the net equity of *each customer* exceeds his ratable share of customer property...." (emphasis added). Including all customers' claims in the customer property allocation and returning any overpayments to SIPC ensures that SIPC does not pay an amount greater than its statutory obligation. The legislative history supports this proposition:

To the extent that property in the single and separate fund is insufficient to discharge claims of customers payable out

---

**2.** Both parties agree that subsection (A) of this   provision is inapplicable to the instant dispute.

of that fund, SIPC is required to advance funds to the trustee to discharge such claims.

House Report at 5264. Hence, although SIPA requires SIPC to make advances prior to any calculation of the customers' pro rata shares of the customer property fund, the timing of these advances does not negate SIPA's limitation on the liability of SIPC.

SIPA's definition of "customer" also supports this proposition. Section 78fff–2(c)(1)(B) requires an allocation of customer property "to customers of such debtor...." A "customer" is "any person who has a claim against the debtor...." *Id.* § 78*lll* (2). The existence and amount of a customer's claim is determined as of the date of a debtor's filing. 15 U.S.C. § 78*lll*-(11). This language shows that a pro rata calculation should include all customers based on the amount of their claims as fixed at the date of filing, not merely unsatisfied customers of the debtor as determined at the time of distribution.[3]

Second, plaintiffs' interpretation would violate SIPA's prohibition against certain customers ("prohibited customers") receiving SIPC advances to satisfy their claims. Section 78fff–3(a)(4) states:

> [N]o advance shall be made by SIPC to the trustee to pay or otherwise satisfy, directly or indirectly, any net equity claim [of certain listed individuals]
>
> . . . .

Under plaintiffs' reading, these listed individuals "indirectly" benefit from SIPC advances because they receive a larger ratable share from the customer property fund than they otherwise would receive if no SIPC funds had been advanced.[4]

Third, plaintiffs' interpretation creates the result that only over-the-limit and prohibited customers would enjoy the benefit of and participate in distributions from the customer property fund. SIPC would always fully satisfy all customers' claims below $500,000 prior to a distribution from the customer property fund, which would eliminate all such customers from inclusion in calculations of ratable distributions from the customer property fund. We find no support for this result in the statutory language or legislative history.

Finally, we disagree with plaintiffs that the adoption of defendants' distribution scheme violates the allocation scheme established by section 78fff–2(c). To be sure, SIPC is participating in the distribution of customer property notwithstanding that all customers' claim have not been fully satisfied. In such a distribution, however, SIPC does not share on an equal basis with customers. Rather, SIPC only recaptures overpayments made to customers after a ratable distribution of assets from the customer property fund. Under such distribution scheme, section 78fff–2(c)(1)—requiring customers of the debtor to share ratably in the customer property fund to the extent of their claims—is being upheld.

---

**3.** The term "ratably" as used in section 78fff–2(c)(1)(B) further supports the conclusion that every customer's claim is to be included in the pro rata calculation of customer property. In the context of insolvency, the Supreme Court has concluded that a "ratable" distribution requires all relevant parties to be treated alike. *United States ex rel. White v. Knox*, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884). "In order to be 'ratable' the claims must manifestly be estimated as of the same point in time, and that date has been adjudged to be the date of declaration of insolvency." *Merrill v. National Bank*, 173 U.S. 131, 143, 19 S.Ct. 360, 365, 43 L.Ed. 640 (1899); *Bevill, Bresler & Schulman, Inc.*, 59 B.R. 353, 363 (Bankr.D.N.J.1986) (stating that a determination of each customer's ratable share of customer property requires a calculation of "the percentage of *all* net equity claims which each customer's claim represents...."). The Su-

preme Court's conclusion in *Merrill* applies with equal force to the instant case because, as noted above, SIPA requires the existence and amount of a customer's claim to be determined as of the date a debtor declares insolvency.

**4.** Defendant also argues that under plaintiffs' interpretation SIPC could vary its exposure by altering the timing of its payments. SIPC, however, is statutorily obligated to make prompt payments. SIPC could never opt to vary its exposure by waiting until after distributions from the customer property fund. Thus, this argument is merely another way of demonstrating that plaintiffs' proposed interpretation exposes SIPC to liability beyond the "extent that property in the [customer property fund] is insufficient to discharge claims of customers payable out of that fund...." House Report at 5264.

SIPC does not take prior to this ratable distribution. *See In re Bevill, Bresler & Schulman, Inc.*, 59 B.R. 353 (D.N.J.1986) (applying a distribution scheme similar to that sought by defendants in the instant case). Thus, contrary to plaintiffs' assertions, our interpretation comports with SIPA's distribution scheme while concurrently upholding SIPA's limit on SIPC's obligation to satisfy customer losses.

An example illustrates the flaws in plaintiffs' interpretation. Assume that a brokerage firm has three customers, 1, 2 and 3, each with one account with respective net equities of $200,000, $700,000 and $100,000. Assume further that customer 3 is a director of the debtor and thus unable to receive SIPC advances pursuant to section 78fff–3(a)(4). The customer property fund totals $100,000. If SIPC made the maximum advances under SIPA before any distributions, customer 1 would receive $200,000 and customer 2 would receive $500,000. Customer 1's claim would be fully satisfied by SIPC advances; the claims of customers 2 and 3 would remain unsatisfied in the respective amounts of $200,000 and $100,000.

Under defendant's interpretation, all claimants would be included in the pro rata calculation of the customer property fund distributions. Each customer's pro rata share would be equal to the fund of customer property divided by the total net equity claims, which in this example is 10% (100,000/1,000,000). This would result in a distribution of $20,000 to customer 1, $70,000 to customer 2 and $10,000 to customer 3.

Based on SIPC advances and customer property fund distributions, customer 1 would have received $220,000, customer 2 would have received $570,000 and customer 3 would have received $10,000. Customer 1 received $20,000 more than the amount of his claim. This $20,000 would be recaptured by SIPC, thus rendering SIPC liable to customer 1 only to the extent that customer 1's net equity exceeded his ratable share of customer property. Customers 2 and 3 would have respective unsatisfied claims of $130,000 and $90,000. SIPC would have advanced an aggregate of $680,000.

Under plaintiffs' interpretation of SIPA, only customers 2 and 3 would be included in the calculation to determine distribution shares of the customer property fund. The pro rata shares of customers 2 and 3 would be 12.5% (100,000/800,000), and their respective shares would be $87,500 and $12,500. Customer 1 would not participate in this distribution because its claim would have been fully satisfied by SIPC's advances. Nor would SIPC participate in this distribution. Customers 2 and 3 would have respective unsatisfied claims of $112,500 and $87,500. SIPC would have advanced $700,000.

As compared to defendants' interpretation, plaintiffs' interpretation gives rise to several problems: 1) SIPC would pay $200,000 to customer 1 notwithstanding that the statute clearly limits SIPC's liability to $180,000—the amount by which customer 1's claim exceeds his ratable share; 2) only customers with claims in excess of $500,000 and customers prohibited from receiving SIPC advances—customers 2 and 3— would participate in distributions from the customer property fund; and 3) customer 3, a customer prohibited from receiving SIPC advances directly or indirectly, would receive $2,500 more than he otherwise would have received had all customers filing claims at the time of debtor's bankruptcy filing been included in the pro rata calculations; thus, SIPC advances increase customer 3's pro rata share because customers receiving such advances are excluded from pro rata calculations for determining customer property fund distributions.

In sum, we reject plaintiffs' proposed interpretation and hold that SIPC may recapture overpayments to customers to the extent that it made advances to such customers. This shall be accomplished by allocating a pro rata share of customer property to all customers with claims at the time a debtor files for bankruptcy protection, adding to this pro rata share any SIPC advances, and then returning to SIPC those amounts which exceed a particular custom-

er's claim up to the amount SIPC advanced to such customer.

We therefore AFFIRM the opinion of the District Court. Because of our disposition of the McKennys' appeal, we hold that Schedel's appeal is MOOT.